## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KG URBAN ENTERPRISES, LLC | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| DEVAL L. PATRICK, in his | ) | |
| official capacity as Governor of | ) | |
| the Commonwealth of Massachusetts, and | ) | |
| | ) | |
| | ) | |
| CHAIRMAN AND COMMISSIONERS | ) | |
| OF THE MASSACHUSETTS GAMING | ) | |
| COMMISSION, in their official capacities | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff KG Urban Enterprises, LLC, by its undersigned attorneys, brings this civil action for declaratory and injunctive relief, and alleges as follows:

### NATURE OF THE ACTION

1.      This is an action to declare invalid and to enjoin legislation signed into law on November 22, 2011, that authorizes casino gaming in the Commonwealth of Massachusetts.  *See An Act Establishing Expanded Gaming in the Commonwealth*, St. 2011, c. 194 ("Act").  The Act violates the Equal Protection Clause and the Massachusetts Declaration of Rights because it contains numerous explicit, race-based set-asides that give federally recognized Indian tribes a categorical advantage over all other applicants in seeking a commercial gaming license in Southeastern Massachusetts. The Act also impermissibly disadvantages the Southeastern region relative to the rest of the Commonwealth based on nothing more than its proximity to Indian

1

tribes.  Finally, the Act conflicts with federal law — and is accordingly preempted — because it authorizes Indian gaming outside the comprehensive federal regulatory framework set forth in the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721 ("IGRA").

2.      Plaintiff KG Urban Enterprises, LLC ("KG") is an equity development company that specializes in the redevelopment and adaptive re-use of urban brownfield sites.  Over the past four years, KG has invested millions of dollars in preparing a comprehensive plan for converting an abandoned and polluted power plant and 29-acre waterfront site in downtown New Bedford into a $1 billion multi-use property that includes a casino gaming floor, restaurants, a hotel, retail shops, and a conference center.  But because of the Act's racial set-aside provisions for Indian tribes, KG will be unable to apply for a gaming license until July 31, 2012, at the earliest, and likely will *never* have the opportunity to apply.

3.      KG seeks a declaratory judgment that the Act's racial set-asides violate the Equal Protection Clause and the Massachusetts Declaration of Rights, and are preempted by federal law.  KG also seeks preliminary and permanent injunctive relief precluding the Commonwealth from enforcing these unlawful provisions of the Act.

## THE PARTIES

4.      Plaintiff KG Urban Enterprises, LLC is a property development boutique that specializes in the redevelopment and adaptive re-use of urban brownfield sites.  KG's office is located at 125 Park Avenue, New York, NY 10017.

5.      Defendant Deval L. Patrick is Governor of the Commonwealth of Massachusetts and is sued solely in his official capacity.  Governor Patrick maintains his principal office at the Massachusetts State House, Office of the Governor, Room 280, Boston, Massachusetts, 02133.

6.      Defendants Chairman and Commissioners of the Massachusetts Gaming Commission are the officers of the newly created Massachusetts Gaming Commission, and are sued solely in their official capacities.

### JURISDICTION AND VENUE

7.      This action is brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202 to redress violations of the United States Constitution, Massachusetts Declaration of Rights, and federal statutes.  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a), and 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  All Defendants reside in this judicial district.

### FACTUAL BACKGROUND

**A.      The Act's Competitive Application Process for Gaming Licenses in the Boston Area and Western Massachusetts**

9.      On November 22, 2011, Governor Patrick signed legislation authorizing a significant expansion of legalized gaming in Massachusetts.  The Commonwealth had previously allowed only bingo, horse and greyhound racing (including simulcast wagering), and the Massachusetts Lottery, but the Act authorizes up to three resort-style casinos — one each in the greater Boston area, Western Massachusetts, and Southeastern Massachusetts — that will offer table games and slot machines, as well as hotel and entertainment facilities.  *See* Act § 16, sec. 19(a).  The Act refers to the three resort-style casinos as the "category 1" facilities.  *See* Act § 16, sec. 2.

10.     The Act also authorizes one license for a "slot parlor" facility containing up to 1,250 slot machines, which is referred to as the "category 2" license.  *See id.* secs. 2, 20.

Because the challenged set-aside for Indian tribes does not apply to the category 2 license, KG will not address the requirements for obtaining that license.

11.     The Act creates a five-member Massachusetts Gaming Commission ("Commission"), and vests that body with broad authority to oversee casino gaming in the Commonwealth.  *See id.* secs. 3-6.  In particular, the Commission is responsible for "issu[ing] a request for applications" for gaming licenses.  *Id.* sec. 8(a).  The Act requires applicants for a gaming license to provide extensive information about their development proposals, finances, and corporate structures, including but not limited to:  the identity of all persons with an interest in the business; "clear and convincing evidence of financial stability"; a description of proposed internal controls and security systems; a description of mitigation measures for compulsive gambling; the design of the proposed casino and the construction timetable; a description of hotel, restaurant, and entertainment facilities; the number of workers to be employed, including pay and benefit information; studies showing the economic benefit to the region and estimated tax revenue; and an assessment of the facility's impact on the environment and public infrastructure.  *Id.* sec. 9(a).

12.     The Act further provides that "[n]o applicant shall be eligible to receive a gaming license" at all unless it meets sixteen enumerated criteria, such as:  paying a $400,000 application fee, identifying a "mitigation plan" for infrastructure costs in the host community, owning the land on which the casino will be built (or having the ability to acquire such land within 60 days), receiving a binding vote from the host community in support of its application, and adopting an affirmative-action plan for construction and operation of the gaming facility.  *Id.* sec 15.

13.     After receiving an application for a gaming license, the Commission must commence an investigation into the "suitability" of the applicant, including its "integrity,

honesty, good character and reputation," its "financial stability," its "business practices," and its

"history of compliance with gaming licensing requirements in other jurisdictions." *Id.* sec. 12(a).

14.     In deciding whether to grant a license to a particular applicant, the Commission

must consider how that applicant's proposal would advance nineteen enumerated objectives,

including:  maximizing capital investment; protecting the state lottery from adverse impacts;

protecting local businesses in surrounding communities; developing programs to prevent

compulsive gambling; utilizing sustainable development principles; providing high-quality jobs

with opportunities for advancement; and maximizing tax revenues. *Id.* sec. 18.

15.     The Commission must conduct a public hearing on each application in the

proposed host community, and must issue a final decision within 90 days after the hearing. *See*

*id.* sec.17(c)-(e).  The Commission has "full discretion as to whether to issue a license," and

applicants "shall not be entitled to any further review if denied by the [C]ommission." *Id.* sec.

17(g).

16.     A successful applicant for a gaming license must pay a one-time license fee of at

least $85 million, must commit to making a capital investment of at least $500 million, and must

pay a 25 percent daily tax on gross gaming revenue. *Id.* secs. 10, 55(a).  The licensee must also

comply with twenty-five additional requirements regarding tax payments, capital expenditures,

law enforcement, ownership structure, compulsive gambling, and affirmative action for

employees and suppliers. *See id.* sec. 21.

17.     The Act provides that each gaming license "shall be valid for an initial period of

15 years," and instructs the Commission to establish procedures for the "renewal" of those

licenses. *Id.* sec. 19(b).

B.     **The Tribal Set-Aside Provisions for a Commercial Gaming License in Southeastern Massachusetts**

18.     None of these finely calibrated regulatory provisions is immediately applicable in the Southeastern region.  The Act refers to the Southeast as "Region C," which includes Bristol, Plymouth, Nantucket, Dukes, and Barnstable counties.  *See id.* sec. 19(a).

19.     After establishing the general procedures for awarding gaming licenses through a competitive application process, the Act creates an entirely separate set of procedures that apply only to federally recognized Indian tribes seeking a commercial gaming license in the Southeastern region.

20.     There are two federally recognized Indian tribes in Massachusetts — the Mashpee Wampanoag Tribe and Wampanoag Tribe of Gay Head (Aquinnah).  Both have indicated that they intend to pursue gaming in Southeastern Massachusetts.

21.     The Aquinnah currently possess only a small parcel of land on a remote corner of Martha's Vineyard.  However, Massachusetts state officials have taken the position that the Aquinnah — by virtue of a 1985 settlement of their land claims — waived any rights to conduct gaming in the Commonwealth.

22.     Under the Commonwealth's view, only one Indian tribe, the Mashpee Wampanoag, is potentially eligible to pursue a commercial gaming license.  But the Mashpee Wampanoag tribe possesses no Indian lands in Massachusetts.  Because the Indian Gaming Regulatory Act limits federally approved gaming to Indian lands — and the federal process for awarding land-in-trust is in a state of paralysis in the wake of *Carcieri v. Salazar*, 555 U.S. 379 (2009) — there is no prospect that the Mashpee Wampanoag will be in a position to engage in casino-style gaming consistent with IGRA in the foreseeable future.

23.     The Act nonetheless grants "federally recognized Indian tribes" (and given the Commonwealth's position on the effect of the Aquinnah's settlement — a single tribe) the exclusive right to seek a commercial gaming license in the Southeastern region at least until July 31, 2012, and likely indefinitely.

24.     Section 91(a) of the Act provides that "[n]otwithstanding any general or special law or rule or regulation to the contrary" — such as the exhaustive, race-neutral application procedures outlined above — "the governor may enter into a compact with a federally recognized Indian tribe in the [C]ommonwealth." Act § 91(a).

25.     The Act categorically precludes the consideration of an application by any non-Indian entity in the Southeastern region until at least July 31, 2012. The Commission is authorized to "issue a request for applications" for a gaming license in the Southeast for non-tribal applicants if and only if "a mutually agreed-upon compact has not been negotiated by the governor and Indian tribe or if such compact has not been approved by the [G]eneral [C]ourt before July 31, 2012." *Id.* § 91(e).

26.     The Act thus effectively grants federally recognized Indian tribes a right of first refusal on a commercial gaming license in the Southeastern region. If a tribe enters into a gaming compact with the governor prior to July 31, 2012 and the General Court approves that compact, then the Commission is prohibited from even *considering* applications from non-tribal entities for a gaming license in the Southeast, regardless of the economic merits of their proposals. *See id.*

27.     The Act further allocates $5 million to the governor for, *inter alia*, "costs related to legal, financial and other professional services required for the negotiation and execution" of

that compact, *id.* § 2A, and requires the Commission to "provide assistance to the governor in negotiating such compact," *id.* § 91(b).

28.     The Act's requirements for a tribal-gaming applicant are minimal.  The governor can negotiate a compact only with a tribe that has "purchased, or entered into an agreement to purchase, a parcel of land for the proposed tribal gaming development and scheduled a vote in the host communities for approval of the proposed tribal gaming development."  *Id.* § 91(c). And the tribal-state gaming compact must be "submitted to the [G]eneral [C]ourt for approval," along with a "statement of the financial investment rights of any individual or entity which has made an investment to the tribe . . . for the purpose of securing a gaming license."  *Id.* § 91(d). But those are the only requirements to grant a tribe an exclusive license to engage in commercial gaming in Southeastern Massachusetts.  *Compare supra*, ¶¶ 11-17 (describing extensive substantive and procedural requirements for non-tribal license applicants).

29.     The license ultimately awarded to the tribe in the Southeast is much more valuable than the licenses available to non-tribal entities.  While non-tribal gaming licenses are limited to an initial period of 15 years, *see* Act § 16, sec. 19(b), tribal compacts permit gaming in perpetuity.

30.     There are two primary effects of the Act's set-aside provisions.  *First*, the Act treats non-tribal entities fundamentally differently from Indian tribes, and completely excludes non-tribal entities from seeking a gaming license in the Southeastern region at least until July 31, 2012, and likely indefinitely.

31.     *Second*, the Act treats non-Indian applicants in the Southeast fundamentally differently from applicants located elsewhere in the Commonwealth, and places the economically depressed Southeastern region at a disadvantage compared to the other two

regions.  In Eastern and Western Massachusetts, gaming licenses will be awarded through an

open and fair application process that is carefully designed to choose the best proposal on the

merits, thus maximizing economic development, job creation, tax revenue, and other benefits to

the area.  In contrast, because of the tribal set-aside provision, the commercial gaming license in

the Southeast will be awarded through a closed, one-sided process in which Indian tribes are

given a categorical advantage over all other applicants, regardless of the economic merits of the

tribes' gaming proposals.  The Southeast is singled out for this disfavored treatment not because

of race-neutral factors such as the need for economic revitalization — which would only *favor*

the Southeast — but instead because of its proximity to Indian tribes.

32.     Finally, the Act also includes an explicitly race-based set-aside for one of the

seats on the newly created Gaming Policy Advisory Committee, which "meet[s] at least once

annually for the purpose of discussing matters of gaming policy."  Act § 16, sec. 68(a).  The Act

requires at least one member of that committee to be "a representative of a federally recognized

Indian tribe in the [C]ommonwealth."  *Id.*

## C.     The Indian Gaming Regulatory Act

33.     The federal Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, was

enacted in 1988 to respond to the special issues raised by gaming on Indian lands in the wake of

the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202

(1987), and to "formulate a system for regulating gaming on Indian lands."  S. Rep. No. 100-446,

at 1 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071 ("S. Rep.").

34.     The express purposes of IGRA are to "provide a statutory basis for the operation

of gaming by Indian tribes" on Indian lands, to shield such gaming from "organized crime and

other corrupting influences," to "ensure that the Indian tribe is the primary beneficiary of the

gaming operation," to "assure that gaming is conducted fairly and honestly," and to establish "independent Federal regulatory authority for gaming on Indian lands." 25 U.S.C. § 2702; *see also* S. Rep. at 1-2.

35.     The statute pursues these goals through a system of "extensive federal oversight [over] all but the most rudimentary forms of Indian gaming." *Tamiami Partners, Ltd. v. Miccosukee Tribe*, 63 F.3d 1030, 1033 (11th Cir. 1995); *see also Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 544 (8th Cir. 1996) (describing the IGRA regulatory scheme as "comprehensive").

36.     IGRA divides Indian gaming into three classes, with varying degrees of regulatory oversight at each level. *See* 25 U.S.C. §§ 2703(6)-(8).  "Class III" gaming is the most highly regulated class of gaming activities, and includes table games and slot machines.

37.     IGRA provides that class III gaming "shall be lawful on Indian lands only if such activities are," *inter alia*, "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." *Id.* § 2710(d)(1)(C). A gaming compact "shall take effect only when notice of approval by the Secretary [of the Interior] of such compact has been published by the Secretary." *Id.* § 2710(d)(3)(B).  The statute instructs the Secretary to disapprove a compact if it violates IGRA, "any other provision of Federal law," or the "trust obligations of the United States to Indians." *Id.* § 2710(d)(8)(B).  In other words, IGRA authorizes Indian tribes to engage in class III gaming if and only if that gaming is conducted on Indian lands pursuant to a compact approved by *both* the host state *and* the Secretary of the Interior.

38.     Moreover, IGRA provides that Indian tribes may conduct class III gaming on Indian lands only if that gaming is "authorized by an ordinance or resolution" that is adopted by

"the governing body of the Indian tribe" and "approved by the Chairman" of the National Indian Gaming Commission.  *Id.* § 2710(d)(1)(A).

39.     The Chairman may approve a tribal gaming ordinance only if:  (1) the tribe has the "sole proprietary interest and responsibility for" the gaming activities; (2) profits from gaming are used only for government, welfare, charitable, or economic development programs; (3) all gaming revenues and outside contracts are subject to annual audits; and (4) there is an "adequate system" for conducting background checks on gaming managers and key employees. *See id.* § 2710(b)(2), (d)(1)(A)(ii).

40.     Before approving a gaming ordinance, the Chairman must also make an express determination that the gaming in question will take place on "Indian lands."  *See Citizens Against Casino Gambling in Erie County v. Kempthorne*, 471 F. Supp. 2d 295, 322-27 (W.D.N.Y. 2007). This is critical because IGRA addresses the unique issues associated with sovereign "Indian lands" and envisions that gaming will take place *only* on such "Indian lands."

41.     Under IGRA, a tribe may not simply purchase a parcel of land then begin to offer gaming on that land.  The statute carefully defines "Indian lands" as land within an Indian reservation, land that has been taken into trust by the federal government, or land over which a tribe exercises sovereignty that is subject by the federal government to restrictions on alienation. *See* 25 U.S.C. § 2703(4).  IGRA also places additional restrictions on gaming on lands acquired after October 17, 1988, which are not part of a tribe's "initial reservation."  *Id.* § 2719(b)(1)(A).

**D.     KG's Investment in the Cannon Street Station Project**

42.     KG is an equity development company that specializes in the redevelopment and adaptive re-use of urban brownfield sites.  KG employs an integrated method of development that incorporates gaming, retail, cultural, and commercial activities into the same project, with no

artificial barriers between the development and the surrounding community.  While many other developers build casinos on undeveloped "greenfield" sites near highway interchanges, those projects require significant alteration of the natural landscape and the extension of roads, bridges, water pipes, power lines, and sewer services to the new sites; they also remain physically isolated from nearby communities.  In contrast, KG's "urban gaming" model focuses on the principles of walkability, connectivity, and sustainability, and focuses in particular on former industrial sites and the rehabilitation of the vintage industrial structures found on such sites.

43.     KG's principals are partners in a joint venture that recently completed the initial phases of an urban gaming redevelopment project on the 130-acre Bethlehem Steel site in Bethlehem, Pennsylvania.  That joint venture, with Las Vegas Sands Corporation, invested more than $900 million to convert an abandoned and deteriorating steel plant site into a thriving, multi-use property that includes casino gaming, hotel, entertainment, and retail components.

44.     In February 2007, KG began the process of identifying suitable property for an urban gaming development project in Massachusetts, which had been on the verge of legalizing casino gaming for several years.  After studying several sites in New Bedford — an industrial city that fit the profile of KG's business model — KG identified a site that currently houses an abandoned power plant known as Cannon Street Station.

45.     Based on a careful market study and exhaustive site analysis, KG identified the Cannon Street property as an ideal candidate for redevelopment because of its proximity to downtown New Bedford's cultural and entertainment center, its location on the historic New Bedford harbor, and the dramatic physical presence of the vintage power plant structure.  KG also concluded that the economically depressed region around New Bedford would benefit

greatly from the jobs, development, and tax revenue that that the Cannon Street Station project would provide.

46.     Upon identifying the Cannon Street property, KG assembled a team of nationally recognized experts to evaluate all aspects of the property and begin creating a master plan for the site's redevelopment and environmental cleanup.  This team consisted of environmental remediation firms, a casino design firm, an open space and landscape design firm, a historic preservationist, a nationally recognized interior design firm, engineering and project management firms, and a team of attorneys.  According to the concept plans, KG and a joint venture partner would rehabilitate the Cannon Street property, remediate environmental contamination, and stabilize both the Cannon Street power plant and the antique granite foundry located on the property.  The concept plans include designs for a multi-level casino, a hotel, restaurants, a conference center, retail shops, parking garages, and an exhibition hall.  This entire property will sit directly on the city's historic harbor and street grid, with walking connections throughout downtown New Bedford.

47.     If KG ultimately receives a gaming license for the Cannon Street site, the total project investment is estimated to be in excess of $1 billion.  This figure includes approximately $50 million for a privately financed cleanup of the severe environmental contamination on the property.

48.     To date, KG has invested more than four years of work and approximately $4.6 million in direct costs to prepare its comprehensive development plan for the Cannon Street Station project.  That investment is specific to the Cannon Street site.  It would take years of work and millions of dollars of additional investment for KG to identify another site with similar characteristics and to prepare a comprehensive development proposal for that site.

49.     KG's Cannon Street investment is not self-sustaining.  KG must make escalating monthly option payments and periodic lump sum premium payments to keep options open on both the Cannon Street Station property and a replacement site for the current owner of that property.  KG also incurs ongoing legal expenses to maintain those option contracts.

50.     KG intends to apply for a gaming license for the Cannon Street site as soon as it is permitted to do so.

51.     Because of the Act's race-based set-asides, however, KG will be locked out of the application process for a gaming license until at least July 31, 2012, and may *never* have an opportunity to compete for a license, regardless of the economic merits of its proposal.

52.     Even in the unlikely event that a tribe does not enter an approved gaming "compact" by July 31, 2012 — in which case a competitive application process will ensue for the license in the Southeast — the ultimate licensee will incur significant harm.  Indeed, pervasive uncertainty about whether non-tribal entities will ever be able to apply for a gaming license in the Southeast is *already* deterring investors and gaming operators from pursuing opportunities in that region.  Moreover, as a result of the tribal exclusivity period, there is a substantial likelihood that the casinos in the Eastern and Western regions — in which there is an open application process from day one, with no tribal preference — will become operational before the casino in the Southeastern region.  Thus, as a result of the race-based limits on the application process in the Southeast, the licensees in the other two regions will have a significant head start in seeking investors, development partners, customers, and advertisers.

53.     By reason of the foregoing, KG has suffered, and will continue to suffer, irreparable harm as a result of the Act's preferences for Indian tribes, for which KG has no adequate remedy at law.

14

## COUNT I
### (Violation of the Federal Equal Protection Clause)

54.      KG hereby repeats and realleges paragraphs 1 through 53 above.

55.      The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

56.      KG has invested more than four years of effort and approximately $4.6 million to prepare a comprehensive redevelopment plan for the Cannon Street Station site in downtown New Bedford.  KG is ready, willing, and able to apply for a gaming license for that site, but — because of the Act's pervasive racial preferences for Indian tribes — KG will be unable to compete for that license on a level playing field.

57.      The Act treats gaming license applicants differently on the basis of race, both procedurally and substantively, in several different respects.

58.      Until July 31, 2012, the Act grants federally recognized Indian tribes the *exclusive* right to seek a commercial gaming license in the Southeastern region.  *See* Act § 91(a), (e).  Non-Indians are categorically barred even from applying for a license during that period, regardless of the economic merits of their proposals.  And if an Indian tribe enters a gaming compact with the governor that is approved by the General Court prior to July 31, 2012, then the Commission is barred from even "issu[ing] a request for applications" from non-tribal entities.  *Id.* § 91(e).

59.      The Act further allocates $5 million of taxpayer funds to the governor for, *inter alia*, "legal, financial, and other professional services required for the negotiation and execution of a [tribal] compact," *id.* § 2A, and requires the Commission to "provide assistance" to the governor in negotiating a tribal compact, *id.* § 91(b).  No comparable funding or assistance is made available to non-tribal license applicants.

60.     Non-tribal entities seeking a commercial gaming license must pay a number of taxes and fees, and must meet an extensive list of requirements regarding financial soundness, capital investment, employment practices, impact on the surrounding communities, public health, and numerous other considerations.  *See* Act § 16, secs. 9(a), 10, 15, 18, 21, 55(a).  Tribes, in contrast, are not expressly bound by those requirements, but instead may obtain a commercial gaming license simply by agreeing to purchase land, scheduling a vote for approval in the local community, and entering into a compact with the governor that is approved by the General Court.  *See id.* § 91.

61.     The Act limits non-tribal licenses to an initial term of 15 years, *see* Act § 16, sec. 19(b), but there is no comparable limit on the duration of tribal gaming compacts.

62.     The Act sets aside a seat on the newly created Gaming Policy Advisory Committee for a "representative of a federally recognized Indian tribe in the commonwealth." *Id.* § 16, sec. 68(a).

63.     The Act treats an entire region of the Commonwealth differently simply because of its proximity to Indian tribes.  In Eastern and Western Massachusetts, gaming licenses will be awarded through an open, competitive process in which the best proposals will be selected based on the economic merits.  In the Southeast, however, gaming licenses are awarded through a closed, one-sided process in which Indian tribes have a categorical advantage over all other applicants, regardless of the economic merits of their proposals.

64.     There is no compelling, or even legitimate, government interest that could justify these explicitly race-based set-asides.  And even if there were, the Act's categorical preferences for Indian tribes are not narrowly tailored to advancing that interest.

65.     The Act accordingly violates the Equal Protection Clause.

## COUNT II
### (Violation of the Massachusetts Declaration of Rights)

66.     KG hereby repeats and realleges paragraphs 1 through 65 above.

67.     Article 1 of the Massachusetts Declaration of Rights, as amended by article 106 of

the Amendments, provides that "[e]quality under the law shall not be denied or abridged because

of sex, race, color, creed, or national origin."  Mass Const. art. CVI.

68.     The "standard for equal protection analysis" under the Declaration of Rights "is

the same as under the Federal Constitution."  *Brackett v. Civil Service Comm'n*, 850 N.E. 2d 533,

545 (Mass. 2006).

69.     The Act treats applicants for a commercial gaming license in Southeastern

Massachusetts differently, both procedurally and substantively, on the basis of race.  *See supra*

¶¶ 56-63.

70.     No legitimate or compelling government interest can justify that differential

treatment, and the Act is not narrowly tailored to achieving any such interest.

71.     The Act accordingly violates Article 1 of the Massachusetts Declaration of

Rights, as amended by Article 106.

## COUNT III
### (Federal Preemption)

72.     KG hereby repeats and realleges paragraphs 1 through 71 above.

73.     The Supremacy Clause of the U.S. Constitution provides that "[t]his Constitution,

and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the

supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the

Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., art. VI, cl. 2.

74.     The Act authorizes Indian tribes to engage in class III gaming without obtaining the federal approvals mandated by IGRA, and includes requirements that are distinct from IGRA's requirements.

75.     The Act provides that a tribal gaming "compact" must be "agreed to by the governor and tribe [and] shall be submitted to the [G]eneral [C]ourt for approval," Act § 91(d), but does not include any requirement that the compact be approved by the Secretary of the Interior, *see* 25 U.S.C. § 2710(d)(3)(B).

76.     The Act does not require that the tribe have a federally approved gaming ordinance in place prior to engaging in such gaming.  *See id.* § 2710(d)(1)(A).

77.     While IGRA permits gaming only on "Indian lands," *id.* § 2703(4), the Act gives exclusivity to a tribe throughout an entire region as long as it has, among other things, merely entered into a commercial agreement to purchase land.

78.     Senior lawmakers have made clear that the very purpose of section 91 of the Act is to permit gaming outside the IGRA framework and to collect greater tax revenue for the Commonwealth than IGRA would permit.  One of the key purposes of IGRA is to ensure that states do not extract excessive taxes or fees from Indian tribes.  *See*, *e.g.*, *id.* § 2710(d)(4).

79.     Under the Supremacy Clause a state cannot frustrate the carefully crafted accommodation of federal, state, and tribal interests embodied in IGRA by creating a separate state-law "Indian gaming" process.  The Commonwealth's alternative state-law gaming regime effectively awards a commercial gaming license to a tribe through a process and under criteria that bear no relationship to IGRA, and are actually contrary to its express requirements.

80.     By authorizing Indian tribes to engage in class III gaming without first obtaining the necessary federal approvals, by granting tribes exclusive commercial gaming rights without

regard to whether the tribes have appropriate "Indian lands," by extending exclusive gaming rights throughout an entire region outside the IGRA process, and in other respects, the Act squarely conflicts with IGRA and is accordingly preempted under the Supremacy Clause.

## RELIEF REQUESTED

KG respectfully requests that this Court enter an order granting judgment in its favor and:

i.      Declare that the Act violates the federal Equal Protection Clause and Massachusetts Declaration of Rights, and is thus invalid, null, and void, in its entirety, or at a bare minimum to the extent it:

>   a.   grants federally recognized Indian tribes an exclusive right to seek a commercial gaming license in Southeastern Massachusetts until July 31, 2012, and likely indefinitely;
>
>   b.   allows Indian tribes to engage in gaming without meeting the same substantive requirements that non-tribal license applicants must meet;
>
>   c.   imposes race-based limitations on open competition for a gaming license in Southeastern Massachusetts, while the competitive process of awarding licenses in the other two regions remains untainted by race;
>
>   d.   requires the Commission to "provide assistance" to the governor in negotiating an unlawful compact;
>
>   e.   appropriates $5 million to facilitate the negotiation of such a compact; and
>
>   f.   reserves one seat on the Gaming Policy Advisory Committee for a member of an Indian tribe.

ii.    Declare that the Act is preempted by federal law and is thus invalid, null, and void to the extent it authorizes Indian tribes to engage in gaming without following the procedures set forth in IGRA;

iii.    Preliminarily and permanently enjoin Defendants from enforcing the unlawful provisions of the Act; and

iv.    Award any other relief, including reasonable attorneys' fees and expenses, *see, e.g.*, 42 U.S.C. § 1988, that the Court deems just and proper.

### JURY DEMAND

KG hereby demands a jury trial on all claims so triable.

Respectfully submitted,

/s/ Kevin M. Considine

November 22, 2011

Kevin M. Considine, BBO #542253
Alexander Furey, BBO #634157
CONSIDINE & FUREY, LLP
One Beacon Street, 23rd Floor
Boston, Massachusetts 02108
(617) 723-7200

Paul D. Clement (*pro hac vice pending*)
Jeffrey M. Harris (*pro hac vice pending*)
Brian J. Field
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090

*Counsel for KG Urban Enterprises, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 22, 2011, a copy of the foregoing

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** was served upon the

counsel for Defendants via hand-delivery at the following address:


       Attorney General Martha Coakley
       Office of the Attorney General of Massachusetts
       One Ashburton Place
       Boston, Massachusetts 02108-1518

       Governor Deval Patrick
       Office of the Governor of Massachusetts
       Massachusetts State House
       24 Beacon Street, Room 280
       Boston, Massachusetts 02133


                      /s/ Kevin M. Considine
                      _____
                      Kevin M. Considine, BBO #542253
                      Alexander Furey, BBO #634157
                      CONSIDINE & FUREY, LLP
                      One Beacon Street, 23rd Floor
                      Boston, Massachusetts 02108
                      (617) 723-7200

                      Paul D. Clement (*pro hac vice pending*)
                      Jeffrey M. Harris (*pro hac vice pending*)
                      Brian J. Field
                      BANCROFT PLLC
                      1919 M Street, N.W., Suite 470
                      Washington, D.C. 20036
                      (202) 234-0090

                      *Counsel for KG Urban Enterprises, LLC*