United States District Court
District of Massachusetts

```
                                    )
KG URBAN ENTERPRISES, LLC,          )
        Plaintiff,                  )
                                    )
        v.                          )    Civil No.
                                    )    11-12070-NMG
GOVERNOR DEVAL PATRICK and          )
CHAIRMAN AND COMMISSIONER OF THE )
MASSACHUSETTS GAMING COMMISSION, )
in their official capacities,      )
        Defendants.                 )
                                    )
```

**MEMORANDUM & ORDER**

GORTON, J.

Plaintiff KG Urban Enterprises, LLC, a casino development
company, challenges provisions of the Act Establishing Expanded
Gaming in the Commonwealth which 1) authorize the Governor of the
Commonwealth to enter into a Tribal-State casino gaming compact
with a federally recognized Indian tribe, 2) appropriate $5
million dollars to facilitate the process and 3) require that at
least one member of the Commonwealth's Gaming Policy Advisory
Committee be a representative of a federally recognized Indian
tribe. The plaintiff alleges that such provisions violate the
Equal Protection Clauses of the United States Constitution and
the Massachusetts Declaration of Rights and are pre-empted by the
Indian Regulatory Gaming Act.

-1-

# I. Background

## A. The Indian Gaming Regulatory Act

In California v. Cabazon Band of Mission Indians, 480 U.S. 202, 212 (1987), the Supreme Court held that states lack the federal statutory authority to regulate gaming on Indian lands.[1] In response, Congress enacted the Indian Regulatory Gaming Act ("IGRA") the following year to establish a statutory basis for Indian gaming on Indian lands, to allow for federal and state regulatory oversight, to shield such gaming from corrupting influences, to clarify that Indian tribes are to be the primary beneficiaries of gaming operations and to ensure that gaming is conducted fairly and honestly. 25 U.S.C. § 2702 (2006).

IGRA creates three categories of gaming and correspondingly ratchets up the level of regulatory oversight commensurate with the stakes involved. Class I gaming, which includes social games with small prizes and traditional forms of tribal gambling, is subject to exclusive regulation by Indian tribes. Id. §§ 2703(6), 2710(a)(1). Class II gaming, which includes bingo and some card games, is subject to joint regulation by tribal authorities and the federal government. Id. §§ 2703(7), 2710(a)(2). Class III gaming is a catch-all category which captures all forms of gaming, including high-stakes gaming, that fall outside the

---

[1]This Memorandum and Order will use the term "Indian" instead of "Native American" because the former term is used in the subject statutes and the governing caselaw.

previous two categories. Id. § 2703(8).

At issue in this case is Class III gaming, otherwise known as casino-style gaming, the most heavily regulated and politically controversial form of gaming authorized by IGRA. An Indian tribe may conduct casino-style gaming on tribal lands only if such gaming is 1) otherwise legal in the state in which it is located, id. § 2710(d)(1)(B), 2) authorized by an ordinance or resolution adopted by the tribe and approved by the Chairman of the National Indian Gaming Commission ("NIGC"), id. § 2710(d)(1)(A), and 3) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State, id. § 2710(d)(1)(C), and approved by the Secretary of the Interior, id. § 2710(d)(3)(B).

IGRA's compacting provision permits states and Indian tribes to work together to develop contract-based regulatory schemes to govern tribal gaming. Id. § 2710(d)(3)(C). This delegation of federal authority provides states with the civil authority to regulate Indian gaming they would otherwise lack. In this way,

IGRA is an example of "cooperative federalism" in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme.

Artichoke Joe's v. Norton, 216 F. Supp. 2d 1084, 1092 (E.D. Cal. 2002).

**B.    The Act Establishing Expanded Gaming in the Commonwealth**

On November 22, 2011, Massachusetts Governor Deval Patrick signed into law the Act Establishing Expanded Gaming in the

-3-

Commonwealth, Mass. Session Laws ch. 194, §§ 1-115 (2011) ("the Gaming Act").[2] The Gaming Act authorizes casino gaming in the Commonwealth and creates a five-member Massachusetts Gaming Commission ("the Gaming Commission") to oversee it.

One of the principal duties of the Gaming Commission is to issue casino licenses. Id. § 8. It is authorized to issue one license to operate a gaming establishment with up to 1,250 slot machines and no table games ("Category Two license") and up to three licenses to operate casinos with both slot machines and table games ("Category One licenses"). Id. §§ 19(a), 20(a).

This litigation concerns the more valuable Category One licenses, each of which entitles its holder to conduct casino gaming in a different region of the Commonwealth.[3] Id. § 19(a). The application process for Category One licenses will begin as soon as the Gaming Commission issues a request for applications, id. § 19(a), with one caveat: if Massachusetts enters into a Tribal-State gaming compact with an Indian tribe, the Gaming Commission will not issue a Category One license for Region C.

_____

[2]The Commonwealth had previously allowed only bingo, horse and greyhound racing (including simulcast wagering).

[3]Region A, which covers the greater Boston area and then some, consists of Suffolk, Middlesex, Essex, Norfolk and Worcester counties. Region B, which covers Western Massachusetts, consists of Hampshire, Hampden, Franklin and Berkshire counties. Region C, which covers Southeastern Massachusetts, consists of Bristol, Plymouth, Nantucket, Dukes and Barnstable counties.

-4-

See id. § 91.

Section 91 of The Gaming Act authorizes the Governor to enter into a compact with a "federally recognized Indian tribe" and lays out procedures to govern the compacting process.[4] The Governor may enter into negotiations with a tribe only if that tribe 1) has purchased or agreed to purchase a parcel of land on which to build the proposed tribal gaming development and 2) has scheduled a vote in the host community for approval. Id. § 91(c). An agreed-to compact must be submitted to the Massachusetts Legislature for approval. Id. § 91(d). If a Tribal-State compact is not negotiated and approved before July 31, 2012, or if the Gaming Commission determines on or after August 1, 2012 that the tribe will not have land taken into trust by the federal government, private entities will be permitted to apply for a Region C Category One license. Id. § 91(e).

Sections 2(a) and 68(a) of the Gaming Act contain related provisions. Section 2(a) appropriates $5 million to the Governor to facilitate the "negotiation and execution" of a Tribal-State compact, while section 68(a) provides that at least one member of the Gaming Policy Advisory Committee ("GPAC"), which will convene at least once annually to discuss gaming policy in Massachusetts,

---

[4]As the plaintiff points out, there are only two federally recognized Indian tribes in Massachusetts potentially eligible to enter into such a compact: the Mashpee Wampanoag Tribe and the Wampanoag Tribe of Gay Head (Aquinnah).

-5-

shall be a representative of a federally recognized Indian tribe.

## C. KG Urban Enterprises, LLC

KG Urban Enterprises, LLC ("KG Urban") is a company that specializes in the redevelopment of former Brownfield sites into multi-use casino gaming properties. Betting on the likelihood that the Commonwealth was on the verge of legalizing casino gaming, KG Urban acquired an abandoned power plant in New Bedford, Massachusetts, known as Cannon Street Station, in February, 2007. Its master plan for the site includes a multi-level casino, a hotel, restaurants, a conference center, retail shops and an exhibition hall. To date, KG Urban has invested approximately $4.6 million to prepare and implement its redevelopment plan. If it ultimately receives a Category One license, its total project investment is likely to exceed $1 billion.

KG Urban characterizes the challenged provisions of the Gaming Act as race-based set asides which unlawfully prevent it from competing for a Category One license in Region C, where Cannon Street Station is located. As KG Urban perceives it, applications in Regions A and B will be considered on their merits, while competition in Region C will be forestalled and likely foreclosed on the basis of race.

## D. Procedural history

On November 22, 2011, KG Urban filed a complaint against Governor Deval Patrick and the Chairman and Commissioners of the

-6-

Massachusetts Gaming Commission (collectively, "defendants")
alleging that the Gaming Act 1) violates the Equal Protection
Clause of the United States Constitution (Count I), 2) violates
the Equal Protection Clause of the Massachusetts Declaration of
Rights (Count II) and 3) is pre-empted by IGRA (Count III).

Pending before the Court is plaintiff's motion for a
preliminary injunction to prevent the defendants from enforcing
the challenged provisions of the Gaming Act. A preliminary
injunction hearing was held on January 31, 2012, after which the
Court took the matter under advisement.

### III. Justiciability

Before reaching the merits of plaintiff's claims, the Court
must first decide the threshold issues of whether they are ripe
for adjudication, whether KG Urban has standing to bring them,
whether the Court has jurisdiction to hear them and, if so,
whether it must abstain from doing so until Massachusetts courts
have had a chance to construe the Gaming Act.

### A. Ripeness

#### 1. Standard

Article III, section 2, of the United States Constitution
restricts federal court jurisdiction to actual "cases" and
"controversies." U.S. Const. art. III, § 2. Ripeness is a
component of the case-or-controversy requirement governing "when
a proper party may bring a justiciable action consistent with

-7-

Article III." Gilday v. Dubois, 124 F.3d 277, 295 (1st Cir. 1997).

In deciding whether a claim is ripe for review, a court considers 1) "the fitness of the issue for immediate review" and 2) "the hardship to the litigant should review be postponed." Riva v. Commonwealth of Mass., 61 F.3d 1003, 1009 (1st Cir. 1995). A critical aspect of the "fitness" prong is whether the claim "involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all." Id. A second consideration is the extent to which the claim is bound up in the facts. Id. at 1009-10.

> Courts are more likely to find a claim ripe if it is of an intrinsically legal nature, and less likely to do so if the absence of a concrete factual situation seriously inhibits the weighing of competing interests.

Id. at 1010. A third factor in the fitness calculus is the "adverseness" of the parties, i.e., whether the facts alleged show a substantial controversy between parties with adverse legal interests and of sufficient immediacy and reality to warrant judicial interdiction. Id. Under the "hardship" prong, a court assesses whether denying relief would impose a significant hardship on a party and whether awarding it would resolve the underlying controversy. Id.

The First Circuit Court of Appeals has cautioned that a constitutional challenge to a statute should not be dismissed on ripeness grounds simply because the challenged provisions have not yet taken effect or are subject to contingent events:

[W]hen the direct application of a statute is open to a charge of remoteness by reason of a lengthy, built-in time delay before the statute takes effect, ripeness may be found as long as the statute's operation is inevitable (or nearly so). And, even when the direct application of such a statute is subject to some degree of contingency, the statute may impose sufficiently serious collateral injuries that an inquiring court will deem the hardship component satisfied.

Id. (internal citations omitted). Collateral effects can rise to this level when "a party must decide currently whether to expend substantial resources that would be largely or entirely wasted if the issue were later resolved in an unfavorable way." Id.

## 2. Application

Defendants argue that Counts I and II are not ripe for adjudication. They frame the constitutional violations alleged by KG Urban as "entirely conjectural," highlighting the possibility that a Tribal-State compact may never come to be. Absent the eventual conclusion and approval of such a compact, they reason, KG Urban has no constitutional injury. Defendants also point out that the mechanism currently preventing KG Urban from competing for a Category One license in Region C is not the compacting provisions but the fact that the Gaming Commission has not yet issued a request for applications in any of the regions and does not plan to do so before October, 2012.

This is not the first ripeness challenge predicated on the uncertainty of the gaming compact negotiation process. Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685 (1st Cir. 1994)

arose from Rhode Island's refusal to negotiate a Tribal-State gaming compact with the Narragansett Tribe. The district court concluded that issues relating to state and local jurisdiction over Indian gaming were unripe because the state and local governments could not exercise jurisdiction unless and until a compact was entered into. The First Circuit disagreed. The jurisdiction issue was ripe, it concluded, because the issue was of immediate importance to the parties, the analysis of which would not be altered by further developments and the resolution of which would alleviate the collateral effects of the legal uncertainty. Id. at 693-94.

Similar considerations warrant a finding of ripeness here. The unsettled constitutionality of the legal provisions at issue in this case hampers not only the compact negotiation process but also region-wide investment in Region C casino developments. Its collateral effects are felt acutely by KG Urban which must decide whether to expend substantial resources to exercise options on and redevelop the Cannon Street Property. Those resources would be wasted if this Court were now to stay consideration of plaintiff's claims only to resolve them in defendants' favor at a later date. Such issues, in this facial challenge to the Gaming Act, are entirely legal in nature and do not require the Court to weigh competing hypothetical interests. Furthermore, Governor Patrick has already begun negotiations with an Indian tribe but

is currently foreclosed from entering into similar negotiations with private entities by the Gaming Act.

KG Urban's claims are fit for immediate review and this Court will rule on them.

## B.  Standing

As with ripeness, standing is a component of the case-or-controversy requirement and a jurisdictional pre-requisite. If ripeness is the "when" of justiciability, standing is the "who." See Erwin Chemerinsky, Federal Jurisdiction (5th ed.) § 2.4, at 117 (2007) ("[S]tanding focuses on whether the type of injury alleged is qualitatively sufficient to fulfill the requirements of Article III and whether the plaintiff has personally suffered that harm, whereas ripeness centers on whether the injury has occurred yet."). Where, as here, a standing issue lurks in the background but defendants do not raise it, the Court will inquire into the matter sua sponte. Fideicomiso De La Tierra Del Cano Martin Peña v. Fortuño, 604 F.3d 7, 16 (1st Cir. 2010).

Article III standing has three core requirements: 1) the plaintiff must have suffered an actual or imminent injury, 2) there must be a causal nexus between the injury and the claimed wrong and 3) it must be likely that the injury will be redressed by a favorable decision. Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 46 (1st Cir. 2011). The burden of proving standing rests on the party seeking to invoke the jurisdiction of

-11-

the federal court and remains on that party throughout the litigation. Benjamin v. Aroostook Med. Ctr., Inc., 57 F.3d 101, 104 (1st Cir. 1995).

To establish standing to bring its equal protection challenges with respect to § 91 of the Gaming Act, KG Urban need not show that it ultimately would win the gaming license if it were given the opportunity to compete for it. Rather, a party such as KG Urban alleging that a state law prevents it from competing for a contract or license on a race-neutral basis, "need only demonstrate that it is able and ready to bid . . . and that a discriminatory policy prevents it from doing so on an equal basis." Ne. Fla. Chap. of Assoc'd Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993).

KG Urban has standing to challenge § 91 of the Gaming Act. By expending $4.6 million to redevelop the Cannon Street Property and by creating a sophisticated urban gaming model in connection with that site, KG Urban has demonstrated that it is "able and ready" to compete for a Category One license. Even though the Region C application process has not been and may never be opened, KG Urban has demonstrated that it would be a competitive candidate if it were given the chance to compete. Under the circumstances, that is all that is required. See Gratz v. Bollinger, 539 U.S. 244, 260-68 (2003) (ruling that plaintiff had standing to challenge allegedly discriminatory transfer-student

-12-

admissions policy, even though he had not yet applied to transfer, because he was ready and able to do so and would have been a competitive candidate). Given the direct relationship between the two sections, the plaintiff likewise has standing to challenge § 2(a), which appropriates $5 million to facilitate the compact-negotiation process.

In contrast, KG Urban lacks standing to challenge § 68(a) of the Gaming Act because it has not carried its burden of establishing that the provision has caused it any injury. A plaintiff lacks standing to challenge an allegedly discriminatory appointment provision where it has not shown that one of its representatives was denied an appointment on the basis of race nor has alleged any other justiciable injury caused by the appointment restriction. See, e.g., Arakaki v. Hawaii, 314 F.3d 1091, 1097-98 (9th Cir. 2002). The complaint does not allege that any of KG Urban's employees or agents has been denied appointment to the GPAC on account of the restriction, nor do the circumstances indicate that any such person is "ready and able" to apply to the GPAC. Because the plaintiff has failed to allege any specific injury stemming from the appointment restriction, it lacks standing to challenge that provision.

## C. Sovereign immunity

The parties dispute whether sovereign immunity deprives this Court of subject-matter jurisdiction to hear plaintiff's federal

-13-

pre-emption claim. Plaintiff declares, correctly, that a federal
court has federal-question jurisdiction over a pre-emption claim
premised on a Supremacy Clause violation. Day v. Bond, 511 F.3d
1030, 1034 (10th Cir. 2007). Defendants respond, correctly, that
sovereign immunity displaces a federal court's subject-matter
jurisdiction to hear an official capacity suit brought against
state officials to enforce IGRA. Seminole Tribe of Fl. v.
Florida, 517 U.S. 44, 74 (1996). Jurisdiction does not lie in
this case, so say the defendants, merely because KG Urban has
refashioned its IGRA claim into one for pre-emption.

In Seminole Tribe, the eponymous Indian tribe sued the
Governor of Florida in his official capacity under 18 U.S.C.
§ 1983 to compel him to negotiate a Tribal-State compact in good
faith, notwithstanding the IGRA provisions which provide for
mediation in the absence of good-faith negotiation. Id. at 51-52.
The Supreme Court held that sovereign immunity prevented the tribe
from bringing an official capacity suit in light of IGRA's
detailed remedial scheme. Id. at 74. Otherwise, the Court
reasoned, parties would simply sue under § 1983 to avoid the
hassle of complying with it. Id. at 75.

KG Urban is correct that the Seminole Tribe limitation on
official capacity suits does not apply to the current case.
Unlike the Seminole Tribe, KG Urban brings neither an IGRA claim
nor an official capacity suit to create the illusion of a private

-14-

right of action under IGRA. Instead, KG Urban alleges that, to the extent that the Gaming Act conflicts with IGRA, the former violates the Supremacy Clause of the United States Constitution. Where, as here, a pre-emption claim is predicated on the Supremacy Clause, not a specific federal statute, the Seminole Tribe limitation does not apply. Duke Energy Trading & Mktg., LLC v. Davis, 267 F.3d 1042, 1055 (9th Cir. 2001). Accordingly, this Court has jurisdiction to decide the plaintiff's federal pre-emption claim.

D. **Abstention**

Unlike the doctrines of ripeness, standing and sovereign immunity, which bear directly upon a court's jurisdiction to hear a case, Pullman abstention is a discretionary doctrine with equitable moorings implicated when a federal court is confronted with an allegation that a state law violates federal rights. The doctrine directs federal courts to abstain from deciding an issue, thus avoiding needless federal friction with state policies and unnecessary constitutional rulings, when a state court construction of the law may obviate its need to do so. Pullman abstention is warranted where

> 1) substantial uncertainty exists over the meaning of the state law in question, and 2) settling the question of state law will or may well obviate the need to resolve a significant federal constitutional question.

Barr v. Galvin, 626 F.3d 99, 107 (1st Cir. 2010).

Defendants contend that even if plaintiff's claims are

-15-

justiciable and the Court has jurisdiction to hear them, the doctrine of Pullman abstention compels the Court to stay consideration of those claims until Massachusetts courts are given the opportunity to rule on them.

Counts I and II do not require abstention because they implicate parallel equal protection provisions of the Massachusetts and United States constitutions. Guiney v. Roache, 833 F.2d 1079, 1082-83 (1st Cir. 1987) ("[W]here state and federal constitutional provisions are parallel, the state provision is unlikely to be any more ambiguous than the federal provision, and abstention is unnecessary.").

Count III presents a closer question. Plaintiff claims that the Gaming Act indirectly authorizes Indian tribes to engage in casino-style gaming outside of Indian lands and without the necessary federal approvals. Defendants deny the substance of both allegations but submit that if the Court were to find either of them persuasive, it would be duty-bound to abstain to allow Massachusetts courts to interpret the Gaming Act in the first instance. For the reasons expounded in Section IV.A.2.b, infra, the provisions at issue are not "substantially uncertain" or amenable to a construction which would allow the Court to avoid the constitutional issue. Accordingly, abstention with respect to Count III is unwarranted as well.

## IV. Preliminary Injunction

To obtain preliminary injunctive relief under Fed. R. Civ.

P. 65, the movant must demonstrate:

> 1) a substantial likelihood of success on the merits of the case, 2) a significant risk of irreparable harm if the injunction is withheld, 3) a favorable balance of hardships, and 4) a fit (or lack of friction) between the injunction and the public interest.

Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). While a court must weigh each factor against the other factors and against the form and magnitude of the relief requested, an injunction will not issue if the movant fails to demonstrate irreparable harm or a likelihood of success on the merits. González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009).

The Court begins with the most important inquiry: whether plaintiff's claims are likely to succeed. Because plaintiff's equal protection claims require the Court to assess whether the Gaming Act was passed pursuant to federal authority delegated pursuant to IGRA, the Court addresses plaintiff's pre-emption claim first.

### A. Federal Pre-emption (Count III)

#### 1. Standard

The Supremacy Clause provides that federal law "shall be the supreme law of the land." U.S. Const. art. VI, cl. 2. Consistent with that command, state laws which "interfere with, or are contrary to the laws of Congress" are invalid. Gibbons v. Ogden,

22 U.S. 1, 82 (1824). Congressional intent "is the touchstone of preemption analysis." Grant's Dairy-Maine, LLC v. Comm'r of Me. Dep't of Agric., 232 F.3d 8, 14 (1st Cir. 2000). A court begins with the presumption that a federal law does not pre-empt an otherwise valid state law and sets aside that presumption only in the face of clear contrary congressional intent. City of Columbus v. Ours Garage & Wrecker Serv., Inc., 536 U.S. 424, 432 (2002).

IGRA was intended "to expressly preempt the field in the governance of gaming activities on Indian lands." S. Rep. No. 100-446, at 6 (1988), reprinted in 1998 U.S.C.C.A.N. 3076. That does not mean that all state laws relating to Indian gaming are automatically pre-empted. To the contrary, IGRA plainly envisions a major role for states in regulating Indian casino-style gaming through the compacting process. It does mean, however, that a state may not set up its own Indian gaming regime separate from IGRA or enact laws that frustrate the purpose of IGRA or are incompatible with its provisions. See Cabazon Band of Mission Indians v. Wilson, 37 F.3d 430, 433 (9th Cir. 1994) (striking down as pre-empted a state licensing fee on wagers placed at off-track betting facilities, as it applied to tribal facilities, because it frustrated the purpose of IGRA).

2.   **Application**

According to the plaintiff, the Gaming Act implicates all three bases for pre-emption: a) it establishes a freestanding

-18-

Massachusetts tribal gaming regime apart from IGRA, b) it
conflicts with IGRA by indirectly authorizing Indian tribes to
conduct casino-style gaming outside of Indian lands and without
the necessary federal approvals and c) it frustrates the purpose
of IGRA by using the prospect of commercial competition to coerce
Indian tribes into agreeing to unfavorable compacting terms.  The
Court addresses each pre-emption theory seriatim.

### a.  Field pre-emption

The Gaming Act does not specifically mention IGRA or require
that Indian gaming be conducted in accordance with federal law.
KG Urban seizes upon those omissions as evidence that the Gaming
Act establishes a separate tribal gaming regime apart from IGRA.
While the plaintiff is correct that "a state has no power
whatsoever to create its own Indian gaming regime," that is not
at all what the Massachusetts Legislature did here.

Under IGRA, the Tribal-State compacting process is governed
by both state and federal law.  The tribe and the state must
first enter into a compact the validity of which is determined by
state law. Pueblo of Santa Ana v. Kelly, 104 F.3d 1546, 1558
(10th Cir. 1997) ("Congress intended that state law determine the
procedure for executing valid gaming compacts.").  Once a valid
compact is entered into, it does not "take effect" under federal
law until the Secretary of the Department of the Interior
approves the compact and a notice of approval is published in the

Federal Register. 25 U.S.C. § 2710(d)(3)(B).

While IGRA's compacting provisions are self-executing, i.e., a tribe may invoke its federal compact-negotiation rights regardless of state law, Congress envisioned that states would legislate the procedures by which IGRA-authorized compacting would take place under their respective state laws. California and North Carolina were among the first states to pass such laws. In 2000, California voters approved Proposition 1A, which amended the California Constitution to give the Governor the authority,

> to negotiate and conclude compacts, subject to ratification by the Legislature [permitting Indian gaming] by federally recognized Indian tribes on Indian lands in California in accordance with federal law.

Cal. Const. art. IV, § 19, cl. f. The North Carolina Legislature followed suit in 2004 by enacting a law allowing federally recognized Indian tribes in the state to conduct gaming "in accordance with a valid Tribal-State compact executed by the Governor" and "approved by the U.S. Department of Interior." N.C. Gen. Laws § 71A-8 (2004). As with California, North Carolina included a provision authorizing its Governor to negotiate and enter into Tribal-State compacts as permitted under federal law. N.C. Gen. Laws § 147-12(14) (2004).

The Gaming Act establishes similar procedures for Massachusetts. It authorizes the Governor "to enter into a compact with a federally recognized Indian tribe in the commonwealth." Mass. Session Laws ch. 194, § 91(a) (2011).

Compact negotiations shall not begin until a tribe

> has purchased, or entered into an agreement to purchase, a parcel of land for the proposed tribal gaming development and scheduled a vote in the host communities for approval.

Id. § 91(c). Once the Governor and a tribe agree on a compact, it "shall be submitted to the [Massachusetts Legislature] for approval." Id. § 91(d).

Considered in that context, the Gaming Act does not create a separate tribal gaming regime in Massachusetts but rather establishes the procedures by which IGRA-authorized compacting may take place under Massachusetts law. Far from conflicting with IGRA, § 91 of the Gaming Act advances the congressional directive that tribes and states negotiate compacts to govern gaming on tribal lands.

### b. Conflict pre-emption

IGRA mandates that tribal gaming take place on Indian lands and that a tribe obtain a federal gaming ordinance and approval from the Secretary of the Interior before conducting casino-style gaming. The Gaming Act is silent on those requirements. The plaintiff infers from that silence that the Gaming Act indirectly authorizes Indian tribes to conduct casino-style gaming outside of Indian lands and without federal approval.

Those claims can also be dispatched rather easily. Section 91 of the Gaming Act lists the requirements which must be met for a compact to be valid under state law. It does not purport to

-21-

supersede the federal procedures required under IGRA in order for that Tribal-State compact later to take effect under federal law. Nothing in § 91 prevents simultaneous compliance with IGRA.

KG Urban's suggestion that § 91 indirectly authorizes Indian gaming outside of tribal lands fails for the same reason. To avoid pre-emption, a state law giving effect to IGRA need not include a separate provision reiterating that IGRA requires tribal gaming to take place only on Indian lands. Nevertheless, the statute implies as much by directing the Gaming Commission to open up the Region C application process to private entities if

the commission determines that the tribe will not have [newly acquired] land taken into trust by the United States Secretary of the Interior.

Id. § 91(e). If a tribe acquires land suitable for gaming but the federal government does not take that land into trust, a tribe will presumably be ineligible to enter into a compact.

The Court need not, however, resort to implication. A separate Massachusetts criminal statute, which applies to tribal and non-tribal entities alike, prohibits operating a casino on state land. M.G.L. ch. 271, § 5. The Gaming Act amended that statute to exclude from its purview gaming establishments operating pursuant to a Category One license. Mass. Session Laws ch. 194, § 58 (2011). It did not correspondingly exempt gaming establishments operating pursuant to a Tribal-State compact. If the Massachusetts Legislature had intended to authorize Indian

gaming outside of tribal lands, it surely would have made its
intentions clear by amending M.G.L. ch. 271, § 5.

For all of those reasons, plaintiff's "conflict" theory of
pre-emption is unavailing.

### c. Frustration pre-emption

IGRA contains measures to protect Indian tribes from being
taken advantage of during compact negotiations. KG Urban
maintains that the Gaming Act frustrates the purpose of those
measures by dictating a compact-negotiation deadline. By
threatening to open up Region C to commercial competition if a
tribe does not agree to terms with the Commonwealth by July 31,
2012, the Gaming Act coerces Indian tribes into accepting
unfavorable compact terms. A firm deadline, it is argued, allows
Massachusetts to fashion a better deal for itself than IGRA allows.

The plaintiff mistakes an incentive for an obstacle. The
Gaming Act surely provides an incentive to a tribe that completes
a compact before the July 31, 2012 deadline: that tribe would
potentially enjoy a region-wide monopoly on casino gaming.[5] If,
however, no compact is reached by the deadline and the Gaming
Commission awards a Region C license to a private entity, an

_____

[5]That prospect does not change the Court's analysis. See,
e.g., Artichoke Joe's v. Norton, 353 F.3d 712, 736 n.19 (9th Cir.
2003) ("That Proposition 1A, unlike IGRA, expressly creates a
tribal monopoly on class III gaming activities does not alter our
conclusion [because it] has no bearing on identifying the
appropriate standard under which to review the state law.").

-23-

Indian tribe in Massachusetts can still assert its IGRA rights to enter into a Tribal-State compact as long as the tribe acquires land-in-trust beforehand. The only difference, in this scenario, is that the tribe will have to compete against a privately-run casino in Region C. Still, IGRA does not require that Indian tribes be permitted to conduct casino gaming free from private competition; it mandates only that tribes be permitted to conduct casino gaming on their land if it is otherwise allowed in the state.

### 3. Conclusion

The Gaming Act does not set up a separate tribal gaming regime apart from IGRA, nor does it purport to supersede federal compact-negotiation rights or procedures. It simply establishes the procedures with which both parties must comply for a Tribal-State compact to be recognized as valid under state law and provides an incentive for tribes to exercise their IGRA rights on an expedited timetable. The Gaming Act neither conflicts with nor frustrates the purpose of IGRA and, therefore, is not pre-empted by it.

### B. Equal Protection (Counts I and II)

The complaint further alleges that the Gaming Act violates the Equal Protection Clauses of the United States Constitution and the Massachusetts Declaration of Rights. Because the two clauses are coextensive, Brackett v. Civil Serv. Comm'n, 850 N.E. 2d 533, 545 (Mass. 2006) ("The standard for equal protection

-24-

analysis under our Declaration of Rights is the same as under the Federal Constitution."), the Court will not bifurcate its equal protection analysis.

### 1. Classification

Where, as here, a state law singling out a particular class of persons is challenged under the Equal Protection Clause, a court begins by examining the nature of the classification. See Barr, 626 F.3d at 108-09. KG Urban would have this Court characterize "federally recognized Indian tribe" as a racial classification subject to strict scrutiny. Section 91, plaintiff contends, is a stark and unprecedented "race-based set-aside" which will inevitably result in a tribal gaming monopoly in Southeastern Massachusetts. Defendants demur and suggest that the classification makes a political distinction between federally recognized tribes and all other entities (including non-tribal organizations owned or controlled by Native Americans), not a racial classification between individual Native Americans and members of other racial groups.

The starting point for any equal protection challenge to a tribal preference is Morton v. Mancari, 417 U.S. 535 (1974). In Mancari, the Supreme Court ruled that an employment preference for qualified members of "federally recognized tribe[s]" by the Bureau of Indian Affairs did not violate the Equal Protection Clause because "the preference is political rather than racial in

nature." Id. at 554 n.24. According to the Court,

The preference is not directed towards a "racial" group
consisting of "Indians"; instead, it applies only to
members of "federally recognized" tribes.

Id. The Supreme Court went on to explain that because the

classification excludes persons who are racially Indian but do

not belong to a federally recognized tribe and includes tribe

members without Indian blood, it is not a suspect classification.

Id. Applying the rational basis test, the Court upheld the

challenged law as rationally related "to the fulfillment of

Congress' unique obligation toward the Indians." Id. at 555.

The Supreme Court has not addressed whether state or local

laws selecting Indian tribes for preferential treatment should be

reviewed under the same deferential standard. On the one hand,

the nature of a classification, in theory, should not change

based upon the identity of the sovereign making it. If a

classification is political when the federal government makes it,

it is difficult to imagine that it could be anything other than

political when a state or local government makes it. On the

other hand, state and local entities lack the constitutional

permission to regulate Indian tribes that the federal government

enjoys. It may be appropriate for courts to apply more searching

review to state and local regulation of Indian tribes given their

lack of authority to legislate in the field.

Lower courts are split with respect to the nature of state

and local tribal classifications and the corresponding level of
scrutiny to which they are subject. Compare Livingston v. Ewing,
455 F. Supp. 825, 830-31 (D.N.M. 1978) (applying rational basis
test to state policy permitting only members of federally
recognized Indian tribes to sell crafts on museum grounds), and
Squaxin Island Tribe v. Washington, 781 F.2d 715, 721-22 (9th
Cir. 1986) ("No compelling state interest need be shown since
preferential treatment for tribal members is not a racial
classification, but a political one."), with Tafoya v. City of
Albuquerque, 751 F. Supp. 1527, 1529-31 (D.N.M. 1990) (applying
strict scrutiny to ordinance allowing only members of federally
recognized Indian tribes to sell wares in the Old Town area of
Albuquerque), and Malabed v. N. Slope Borough, 42 F. Supp. 2d 927,
937-42 (D. Alaska 1999) (applying strict scrutiny to employment
preference for "any person belonging to an Indian tribe").

The government's power to regulate Indian affairs, which
implicates weighty constitutional issues, should not rise or fall
on a facile distinction. "Federally recognized Indian tribes"
are quasi-sovereign political entities, to be sure, which is why
some courts characterize the classification as political. Their
members, however, share more than a like-minded spirit of civic
participation; they share the same racial heritage.[6] See Paul

---

[6]The two federally recognized Indian tribes in Massachusetts
are no different: both limit tribal membership to those who can
establish Indian racial ancestry.

Spruhan, A Legal History of Blood Quantum in Federal Indian Law to 1935, 51 S.D. L. Rev. 1, 12 (2006) (cataloging federal blood-quantum requirements); Kirsty Gover, Genealogy as Continuity: Explaining the Growing Tribal Preference for Descent Rules in Membership Governance in the United States, 33 Am. Indian L. Rev. 243 (2009) (cataloguing tribal blood-quantum requirements). Mancari ignores this crucial fact and proceeds from the irrational assumption that race is "nothing more than a politically meaningless classification based on ancestry" and that "tribal membership is purely a matter of voluntary civic participation." Annie C. Rolnick, The Promise of Mancari: Indian Political Rights as Racial Remedy, 86 N.Y.U. L. Rev. 958, 1001 (2011).

By characterizing tribal distinctions as solely political, the Supreme Court has avoided grappling with complex constitutional issues such as the scope of congressional power to regulate Indian affairs and the inherent tension between the Indian Commerce Clause and the Equal Protection Clause. As one constitutional scholar put it, the political classification doctrine is "almost talismanic; a magical incantation, without accompanying analysis, to make the issue go away rather than to address it." David C. Williams, The Borders of the Equal Protection Clause: Indians As Peoples, 38 U.C.L.A. L. Rev. 759, 790-91 (1991).

If this Court were addressing the issue as one of first impression, it would treat Indian tribal status as a quasi-

political, quasi-racial classification subject to varying levels of scrutiny depending on the authority making it and the interests at stake. Federal laws relating to native land, tribal status or Indian culture would require minimal review because such laws fall squarely within the historical and constitutional authority of Congress to regulate core Indian affairs. Laws granting gratuitous Indian preferences divorced from those interests, such as Circuit Judge Alex Kozinski's hypothetical monopoly on Space Shuttle contracts, Williams v. Babbitt, 115 F.3d 657, 665 (9th Cir. 1997), or, more germanely, a law granting tribes a quasi-monopoly on casino gaming, would be subject to more searching scrutiny.

This case is not, however, one of first impression. A few years after Mancari, the Supreme Court decided that under at least one circumstance an Indian-related state law is subject to rational basis review as if it were a federal law. In Washington v. Confederated Bands and Tribes of Yakima Indian Nation ("Yakima"), 439 U.S. 463 (1979), the Supreme Court reviewed an equal protection challenge to a Washington law which bestowed upon the courts of that state the authority to assume partial civil and criminal jurisdiction over Indians and Indian tribes on Indian land. The Court began by noting that the federal government has the constitutional authority to single out Indian tribes for special treatment, while "States do not enjoy this same unique relationship with Indians." Id. at 500-01. It went

-29-

on to apply rational basis review, despite that critical
difference, because the Washington law

> is not simply another state law. It was enacted in
> response to a federal measure explicitly designed to
> readjust the allocation of jurisdiction over Indians. .
> . . For these reasons, we find the argument that such
> classifications are "suspect" an untenable one.

Id. at 500-01. Thus, if Congress delegates a portion of its
Indian regulatory authority to the states, a state law enacted
pursuant to that delegated authority is subject to rational basis
review as if it were federal law.

Applying that principle, the Ninth and Fourth Circuits have
rejected equal protection challenges to state laws authorizing
the Governors of California and North Carolina, respectively, to
enter into Tribal-State gaming compacts. Artichoke Joe's v.
Norton, 353 F.3d 712 (9th Cir. 2003); United States v. Garrett,
122 F. App'x 628 (4th Cir. 2005). The Circuit Courts recognized
that IGRA was explicitly designed to re-adjust federal/state
regulatory authority over Indian gaming on Indian lands and
concluded that the challenged state gaming laws were enacted
pursuant to that delegated authority. Artichoke Joe's, 353 F.3d
at 736; Garrett, 122 F. App'x at 631-33. In accordance with
Yakima, both Circuit Courts applied the rational basis test.

The equal protection principles articulated in Mancari and
Yakima compel the same result in this case. Neither party
disputes that, by enacting IGRA, Congress delegated a portion of

its authority to regulate Indian gaming to the states. It is
likewise evident that the Massachusetts Legislature adopted
sections 2(a) and 91 of the Gaming Act pursuant to that delegated
authority. Congress envisioned that states would enact laws to
govern and facilitate the Tribal-State compacting process. See
Section IV.A.2, supra. Sections 2(a) and 91 of the Gaming Act,
enacted in the wake of parallel legislation in California and
North Carolina, do exactly that and nothing more. Bound by
Yakima, this Court will apply the rational basis test.

### 2. Rational basis review

Under the rational basis test, state tribal classifications
are valid unless they bear no rational relationship to any
legitimate state interest. Yakima, 439 U.S. at 502. State
compacting legislation analogous to § 91 of the Gaming Act has
been upheld as rationally related to a state's interest in
1) promoting cooperative relationships with the Indian tribes
residing within its borders, 2) fostering tribal sovereignty,
economic development and self-sufficiency and 3) regulating vice
activities in compliance with a federal scheme which fulfills
Congress's unique obligation towards Indian tribes. Artichoke
Joe's, 353 F.3d at 736-42; Garrett, 122 F. App'x at 633. Sections
2(a) and 91 are rationally related to the same interests and thus
are consistent with the Equal Protection Clauses of the United
States Constitution and the Massachusetts Declaration of Rights.

-31-

### 3. Plaintiff's contentions

The plaintiff urgently disagrees and implores the Court to review the Gaming Act under strict scrutiny on the grounds that a) it is not mandated by a uniform federal scheme and b) Mancari is no longer good law. Unfortunately, governing caselaw is to the contrary and while the Court shares the plaintiff's frustration with the prevailing equal protection doctrine, the Court declines plaintiff's invitation to ignore it.

### a. Plaintiff's proposed standard ignores precedent and public policy

Plaintiff's first contention relates to the scope of the delegation doctrine announced in Yakima. According to KG Urban, the fact that a state law singles out Indian tribes "in response" to a jurisdiction-shifting federal scheme should not be enough to avoid strict scrutiny. Instead, it proposes, strict scrutiny should apply to any such state law unless it is "mandated by a uniform federal scheme." KG Urban acknowledges that its proposed standard, which it borrowed from alienage law, has not been applied in the Indian law context but it nonetheless reasons that, given the similarities between the two areas of law, the same standard should apply to both.[7]

---

[7] Reviewed under the plaintiff's proposed standard, the Gaming Act would almost certainly be subject to strict scrutiny: while IGRA envisions that states will enact supplemental legislation to govern the compacting process, it does not mandate that states do so.

The plaintiff cites precious little authority for its proposed interpretation and finds none in Yakima itself. The federal law in that case permitted but, importantly, did not require, states to assume civil and criminal jurisdiction over Indian land. 439 U.S. at 473 n.9. More recent equal protection cases are similarly unavailing. E.g., Artichoke Joe's, 216 F. Supp. 2d at 1131 n.63 (rejecting plaintiffs' argument that "strict scrutiny applies because Congress did not 'affirmatively direct' the states to adopt a specific policy in favor of class III gaming"). In short, no precedent supports such an abrupt shift.

Moreover, adopting the mandated-by-a-uniform-federal-scheme standard from the alienage context makes little sense as a policy matter. Admittedly, Indian law and alienage law have their similarities. Article I of the Constitution grants Congress plenary power to legislate in both fields and the standard of equal protection review in each field depends, in large part, on which government actor, state or federal, enacted the law. The plaintiff overlooks one crucial distinction, however. A strict, uniform federal alienage policy makes sense: a hodgepodge of state immigration laws would wreak havoc on our federal system. Indeed, the Immigration and Nationality Act of 1952 was enacted, in large part, to prevent one state's immigration policy from imposing negative "externalities" on surrounding states or the federal government.

That concern does not apply to the Indian context. One

state's treatment of Indian tribes residing within its borders

does not directly impact other tribes or other states. Moreover,

[i]t makes sense for Indian law doctrine to allow states
considerable flexibility when acting consistently with
current federal Indian policy.

Shira Kieval, Discerning Discrimination in State Treatment of

American Indians Going Beyond Reservation Boundaries, 109 Colum.

L. Rev. 94, 129 (2009). A stricter standard would undermine

IGRA's balance of cooperative federalism and could cause

unnecessary confusion to state governments.

A narrow reading of Yakima's delegation doctrine is both

unprecedented as a matter of law and unwarranted as a matter of

policy.

### b. Mancari is binding precedent

KG Urban confidently asserts that the Supreme Court's

initial characterization of tribal classifications as political,

not racial, is no longer good law in the afterglow of Adarand

Constructors, Inc. v. Peña, 515 U.S. 200 (1995).

At issue in Adarand was a federal law that gave minority-

owned businesses preference in bidding on federal highway

contracts. 515 U.S. at 205. The affirmative action program

benefitted a wide variety of racial minorities, including "Native

Americans." Id. The Supreme Court struck down the law and

announced the current rule that all racial classifications,

whether made by a federal, state or local government actor, are subject to strict scrutiny. Id. at 227. As a result, the government may no longer give preferential treatment to "Native Americans" as a racial group. The Court did not address whether the new rule applied to laws directed at federally recognized Indian tribes but a related issue arose five years later in Rice v. Cayetano, 528 U.S. 518 (2000).

In Rice, the subject law of Hawaii limited the right to vote for the position of Trustee of the Office of Hawaiian Affairs to those with native Hawaiian ancestry. 528 U.S. at 499. The State argued that the classification was not racial because it applied to everyone whose ancestors were in Hawaii at a particular time, regardless of their race. Id. at 514. The Supreme Court rejected that argument and applied strict scrutiny, reasoning that the purpose and effect of the statute was to use ancestry as a proxy for race. Id.

The plaintiff equates the tribal classification in this case with the ancestry classification in Rice. Both classifications, the plaintiff contends, use ostensibly non-racial distinctions as racial proxies. That argument would be persuasive had the Supreme Court not rejected it in Rice. There, the Court declined Hawaii's invitation to predicate preferential treatment of native Hawaiians on the Court's analogous treatment of Indian tribes. Id. at 518-20. The Court first noted that the Constitution

-35-

authorizes Congress to treat Indian tribes differently but concluded that such authority does not extend to tribeless native Hawaiians. Id. at 519. The Court further distinguished Mancari by noting that the classification in that case "was political rather than racial." Id. at 520. By distinguishing Mancari instead of overruling or ignoring it, the Supreme Court signaled that tribal classifications are not racial proxies and that Mancari remains good law.

This Court has already expressed its humble opinion that Mancari makes an artificial distinction which undermines the constitutional requirement of race neutrality. Nevertheless, as the foregoing analysis suggests, Mancari remains good law. Even if that conclusion were in doubt, the Court would be obligated to apply Mancari because the Supreme Court has not expressly overturned it. Agostini v. Felton, 521 U.S. 203, 237 (1997) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [a lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

## C. Conclusion

Because none of plaintiff's claims is likely to succeed, i.e., the Gaming Act is not pre-empted and does not violate state or federal equal protection clauses, a preliminary injunction is

unwarranted. United States v. Weikert, 504 F.3d 1, 5 (1st Cir. 2007) ("If the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.").

## ORDER

In accordance with the foregoing, plaintiff's motion for a preliminary injunction (Docket No. 2) is **DENIED**. Moreover, because plaintiff brings only a facial equal protection challenge to the Gaming Act and no further briefing or proceedings would affect this Court's constitutional analysis, plaintiff's complaint (Docket No. 1) is hereby **DISMISSED**.

**So ordered.**

Nathaniel M. Gorton

Nathaniel M. Gorton
United States District Judge

Dated February **16**, 2012