**United States District Court**
**District of Massachusetts**

```
_____
                              )
KG URBAN ENTERPRISES, LLC,    )
        Plaintiff,            )
                              )
        v.                    )    Civil Action No.
                              )    11-12070-NMG
GOVERNOR DEVAL PATRICK and    )
CHAIRMAN AND COMMISSIONER OF THE )
MASSACHUSETTS GAMING COMMISSION, )
in their official capacities, )
        Defendants.           )
_____)
```

**MEMORANDUM & ORDER**

GORTON, J.

Plaintiff alleges in its Amended Complaint that a provision
of an Act Establishing Expanded Gaming in the Commonwealth, 2011
Mass. Acts ch. 194 ("the Gaming Act"), unconstitutionally
prevents it from competing for a commercial gaming license in
southeastern Massachusetts.  More than one year after the
original Complaint was filed, defendant Massachusetts Gaming
Commission ("the Gaming Commission") began accepting applications
for commercial gaming licenses in southeastern Massachusetts.
Currently before the Court is defendants' motion to dismiss the
Amended Complaint for mootness.

I.  **Background**

The relevant allegations and background law have been
exhaustively recounted in the prior opinions of this Court and of

-1-

the First Circuit Court of Appeals.  This Court presumes familiarity with those opinions and summarizes here only the background essential to the resolution of the pending motion.

### A.    The Amended Complaint and § 91(e) of the Gaming Act

Plaintiff filed the Amended Complaint in January, 2013, which, in addition to addressing the events leading up to and following the First Circuit's remand of the case in August, 2012, also narrowed the relief sought.  In its original Complaint, plaintiff sought a ruling that the whole of § 91 of the Gaming Act violated the Equal Protection Clause and the Massachusetts Declaration of Rights, including the provisions that authorized the Governor to negotiate tribal-state gaming compacts and to set forth the requisite procedures for doing so.  In the Amended Complaint, plaintiff challenges only § 91(e), which limits the ability of the Gaming Commission to consider bids for commercial licenses in Region C when a tribal-state gaming compact has been negotiated between the Governor and an Indian tribe and approved by the General Court before July 31, 2012. See M.G.L.c. 194, § 91(e).

The Amended Complaint proceeds in three counts: Count I alleges that § 91(e) creates a race-based set-aside by granting federally recognized Indian tribes the exclusive right to seek a gaming license in Region C, in violation of the Equal Protection Clause; Count II alleges that the (then) ongoing refusal by the

Massachusetts Gaming Commission to open Region C to commercial applications is based upon race and violates the Equal Protection Clause; and Count III alleges that the foregoing also violates the Massachusetts Declaration of Rights.

As relief, the Amended Complaint asks the Court to declare unconstitutional § 91(e) of the Gaming Act and the Gaming Commission's refusal to consider commercial applications. Plaintiff also seeks injunctive relief 1) prohibiting enforcement of "the regional exclusivity provisions" of the Gaming Act and 2) ordering the Gaming Commission to commence a commercial application process that is "under the same race-neutral terms and conditions that apply in Regions A and B" and includes provisions designed to compensate for the delay in opening Region C to a competitive process. See Am. Compl. at 20, Docket No. 83.

### B.  The Decision by the Massachusetts Gaming Commission to Accept Commercial Licensee Applications for Region C

In December, 2012 the Gaming Commission solicited public comment on a so-called "dual track" proposal under which it would begin accepting commercial applications for a Category One gaming license in Region C while the Mashpee Wampanoag Tribe ("the Mashpee") continued to pursue the federal approvals necessary to operate a tribal casino there.  Notably, under that proposal, the Gaming Commission would terminate the commercial application process in Region C if, at any point in the future, it determined that the Mashpee had made substantial progress toward eligibility

for gaming compliant with the Indian Gaming Regulatory Act ("IGRA").  During the December, 2012 status conference, plaintiff complained to the Court that such a proposal would not diminish its need for relief because it essentially granted the Mashpee a "veto" over the commercial application process.  Ultimately, after it held a public meeting, and at the request of the Mashpee, the Commission resolved to take no action on the "dual track" proposal for 90 days.

In March, 2013, the Gaming Commission solicited public comment on a second proposal, wherein it would invite commercial applications for a Category One license in Region C and, upon completion of the process, determine whether to issue a commercial license.  That decision was to be made based upon the strength of the commercial applications received by the Commission and any tribal-state compact existing between the Commonwealth and the Mashpee.

On April 18, 2013, one week after this Court held its last status conference, the Gaming Commission voted to adopt that proposal and begin accepting commercial applications for Region C.  Specifically, the Gaming Commission resolved to determine whether to issue a license

> after taking into account economic and other circumstances as they exist at the time of the licensing decision[,] in light of the statutory objective[s] that govern expanded gaming in the Commonwealth and the discretion with which the expanded gaming statute clothes the Commission.

-4-

See Comm'n Pub. Mtg. Tr. at 105, Docket No. 104, Ex. A.  The
Gaming Commission acknowledged that this determination will take
into account the economic consequences of the then-current status
of the tribal-state and federal land-in-trust proceedings.

On June 7, 2013, the Gaming Commission issued a request for
commercial applications for Category I licenses in Region C and
set a deadline of September 30, 2013.  It now anticipates making
a determination on whether to issue a commercial license or not
in late 2014.

### C.  Procedural History

Plaintiff sought preliminary injunctive relief in late
November, 2011, which this Court denied in February, 2012.  In
August, 2012 the First Circuit affirmed this Court's denial of
injunctive relief but reversed the dismissal of plaintiff's case
and remanded for further proceedings.

On remand, both federally recognized Indian tribes residing
in Massachusetts, the Mashpee and the Aquinnah, filed motions to
intervene in September, 2012.  The Court heard oral argument on
those motions in December, 2012, and permitted the putative
intervenors to respond to plaintiff's Amended Complaint during
January, 2013.  Following a third status conference in April,
2013, the Court ultimately denied the pending motions to
intervene.

Because the Court found a question of mootness had been

-5-

raised by the Gaming Commission's decision to begin accepting commercial license applications for Region C in May, 2013, it permitted the defendants to file the instant motion to dismiss on those grounds.  The Court heard oral argument on the motion in July, 2013 and took the matter under advisement.

## II.  <u>Analysis</u>

Defendants now move to dismiss the Amended Complaint on the grounds that the decision of the Gaming Commission to begin accepting commercial applications for Region C has rendered the Amended Complaint moot.  That is purportedly so because the "only functional relief" sought by plaintiff was an injunction ordering the Gaming Commission to begin accepting applications on the same "race-neutral" terms that apply in Regions A and B.

Plaintiff denies that the Amended Complaint is moot and argues, to the contrary, that the Gaming Commission's action falls within the voluntary cessation exception to the mootness doctrine.  This Court agrees and defendants' motion to dismiss will, therefore, be denied.

### A.   **Mootness Doctrine and the Voluntary Cessation Exception**

Mootness is a constitutional requirement mandating that "an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed." <u>Am. Civil Liberties Union of Massachusetts</u> v. <u>U.S. Conference of Catholic Bishops</u>, 705 F.3d 44, 52 (1st Cir. 2013) (internal quotations and

citations omitted).  The burden of establishing mootness rests with the party invoking the doctrine. Id.

The First Circuit has adopted various formulations of identifying when a case has become moot, i.e.:

1)   when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome;

2)   when the court cannot give any effectual relief to the potentially prevailing party; and

3)   if events have transpired to render a court opinion merely advisory.

See id. at 52-53 (internal quotations and citations omitted).

When a defendant voluntarily ceases committing the offending activity, courts impose additional requirements upon him in order ensure that the defendant is not "temporarily alter[ing] questionable behavior" in order to evade judicial review. Catholic Bishops, 705 F.3d at 54 (citations omitted).  As a result, voluntary cessation of challenged conduct does not ordinarily render a case moot unless the defendant meets the "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Id. at 55 (citations omitted).

Voluntary cessation doctrine, however, does not apply when cessation of the challenged activity "occurs because of reasons unrelated to the litigation," such as when the challenged conduct lapses by its own terms, without reference to the defendant's

conduct.  <u>See</u> <u>id.</u> (passage of expiration date in contract rendered voluntary cessation exception inapplicable).

### B.    Application

Whether the Gaming Commission's action has rendered the Amended Complaint moot is unclear.  Although the Commission has initiated the commercial application process in Region C, plaintiff argues that the process is still not on the "same race neutral terms" applied to Regions A and B because applications in Region C will be impacted by the likelihood of tribal gaming in Region C.  The Court need not resolve that issue here, however, because the Gaming Commission's action falls within the voluntary cessation exception to the mootness doctrine and defendants cannot satisfy the "formidable burden" imposed thereunder.

The voluntary cessation exception applies here because it is clear that defendants initiated the commercial application process in Region C out of concern for the instant litigation. At the April, 2013 hearing in which the Commission resolved to begin accepting commercial bids, Commissioner McHugh explained that he did not think "waiting is an option" because the Commissioners are "defendants in a lawsuit" and the First Circuit's decision discusses

> how the longer we wait without an undefined [sic] deadline, the more the wait begins to look like a violation of the equal protection clause of the 14th [A]mendment.

Pub. Mtg. Tr. at 93-94, Docket No. 104, Ex. A.  Although

defendants claim that the decision to open Region C was motivated solely by the indefiniteness of the land-in-trust process, that argument is simply the converse of Commissioner McHugh's concern that waiting indefinitely for resolution of the land-in-trust process could violate the Fourteenth Amendment.

Defendants also claim that the Gaming Commission acted because a longer wait would further diminish the likelihood that any gaming facility would be built in Region C, an outcome which the Commission wished to avoid.  The existence of an independent reason favoring initiation of the commercial application process is insufficient to demonstrate that the decision of the Commission to suspend the challenged conduct was "unrelated to the litigation." See Catholic Bishops, 704 F.3d at 55 (noting circuit courts have found exception does not apply when cessation "is not brought about or hastened by any action of the defendant") (emphasis added).  If an independent reason sufficed, a defendant could defeat the voluntary cessation exception and evade judicial review merely by advancing a credible cover story. Here, Commissioner McHugh's statement demonstrate that the Gaming Commission was impelled, at least in part, by the instant litigation.  That evidence is sufficient to render the exception applicable. Cf. Catholic Bishops, 704 F.3d at 55 (expiration of challenged contract, by its own terms, constituted circumstance unrelated to the litigation).

Thus, the voluntary cessation doctrine applies and defendants bear the "formidable burden" of demonstrating that it is "absolutely clear" the challenged conduct could not reasonably be expected to recur.  Here, defendants merely suggest that the Commission has publicly committed to completing the commercial application process, without any "escape hatch."  Unlike under the "dual track" proposal discussed in December, 2012, where a successful Mashpee application would short-circuit the commercial application process, by adopting the current proposal the Commission has publicly committed to evaluating the commercial applications and the tribal-state compact side-by-side at the close of the process.  Put differently, defendants' argument boils down to "trust us" and does not offer an assurance that defendants lack the power to reinstate the offending conduct.

Such contentions fail to demonstrate an "absolute certainty" that the challenged conduct could not "reasonably be expected to recur" because they rest entirely upon the defendants' discretion rather than upon any enforceable promises that defendants will not resume the challenged conduct.  For example, the Supreme Court recently determined that the voluntary cessation exception had been satisfied when a defendant executed a covenant with the plaintiff and promised, in perpetuity, to cease all challenged conduct.  See Already, LLC v. Nike, Inc., 133 S. Ct. 721, 725 (2013).  Similarly, the First Circuit held that the exception had

been satisfied when the challenged public contracts had expired, the policy under which the contracts were approved had changed and the contracting federal agency had changed administration. See Catholic Bishops, 704 F.3d at 55-56.

Rather, the circumstances at issue here are most analogous to the facts considered by the Supreme Court in an early case recognizing the need for the voluntary cessation exception. In City of Mesquite v. Aladdin's Castle, Inc., the City argued that plaintiff's challenge had been mooted by the decision of the municipal legislative body to repeal the offending ordinance while the case was pending on appeal. See id. at 288. The Supreme Court decided to reach the merits of plaintiff's appeal because, although the issue had been mooted, nothing precluded the city "from reenacting precisely the same provision" once the case was dismissed. Id. at 289.

Likewise nothing precludes the Gaming Commission here from simply changing its mind and cancelling the commercial application process in Region C. No provision of the Gaming Act prevents it from doing so and, in fact, the Commission based its current decision to accept commercial applications upon authority "impliedly" conferred upon it under the Gaming Act to accept commercial applications whenever it is appropriate to do so, rather than upon the language of § 91(e). By logical extension, then, the Gaming Commission claims the discretion to suspend the

-11-

process whenever it deems appropriate, as well.

Defendants also cannot show that it is "absolutely certain" the challenged conduct could not reasonably be expected to recur because the Mashpee has publicly threatened to sue the Gaming Commission on account of its decision to begin accepting commercial applications in Region C.  The Supreme Court has found that the "formidable burden" imposed by the voluntary cessation exception was not met when the defendant's decision to cease the challenged conduct was "patently incompatib[le]" with relevant law and would be subject to the threat of a lawsuit by a third party.  See Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222-24 (2000).  Here, the Mashpee has decried the Commission's decision and has argued publicly that, under § 91(e) of the Gaming Act, the Commission cannot initiate the commercial application process until the Department of the Interior rejects the Mashpee's land-in-trust application.

Although the Gaming Commission's legal position does not appear to be as tenuous as was the defendant's position in Adarand, the Adarand court deemed the threat of third-party suit to be sufficiently credible even absent an identified third party who would potentially sue.  Accordingly, even though the threat of such a suit here is still hypothetical, as defendants contend, the Court concludes that the possibility of a lawsuit by the Mashpee is also sufficient to forestall dismissal of the case for

mootness. <u>See</u> <u>id.</u> at 224 (reversing lower court because prospect that defendant would resume harmful conduct was "too speculative" to support standing but "not too speculative to overcome mootness").

Accordingly, defendants have failed to carry the "formidable burden" imposed by the voluntary cessation exception to the mootness requirement and their motion to dismiss for mootness will, therefore, be denied.

<b>ORDER</b>

In accordance with the foregoing, defendants' motion to dismiss the Amended Complaint for mootness (Docket No. 114) is **DENIED.**

**So ordered.**

/s/ Nathaniel M. Gorton<br>Nathaniel M. Gorton<br>United States District Judge

Dated August 16, 2013