United States District Court
District of Massachusetts

```
_____
                                )
KG URBAN ENTERPRISES, LLC,      )
                                )
          Plaintiff,            )
                                )
          v.                    )      Civil Action No.
                                )      11-12070-NMG
GOVERNOR DEVAL PATRICK and      )
CHAIRMAN AND COMMISSIONERS OF   )
THE MASSACHUSETTS GAMING        )
COMMISSION, in their official   )
capacities,                     )
                                )
          Defendants.           )
_____)
```

### MEMORANDUM & ORDER

**GORTON, J.**

In November, 2011, casino developer KG Urban Enterprises, LLC ("KG Urban") brought suit against Governor Deval Patrick ("Governor Patrick") and the Massachusetts Gaming Commission ("the Commission"), challenging the Act Establishing Expanded Gaming in the Commonwealth ("the Gaming Act") as unconstitutional. After this Court denied plaintiff's motion for a preliminary injunction and dismissed the case, the First Circuit Court of Appeals reversed and remanded, directing this Court to provide defendants with a "limited grace period" for a federally recognized Indian tribe to meet the requirements of the Indian Gaming Regulatory Act ("IGRA"). In the interim, the Court denied motions to intervene by Massachusetts's two

-1-

federally recognized Indian tribes and denied defendants' motion to dismiss for mootness.

With ancillary matters resolved and the case substantially narrowed to its core equal protection issue, now pending before the Court are cross-motions for summary judgment from both parties.  For the foregoing reasons, the Court finds no constitutional infirmity in either § 91 of the Gaming Act or the Commission's review of commercial casino applications.

I.   **Factual Background and Procedural History**

The voluminous factual history of this case has been described at length in the prior memoranda and orders of this Court and the First Circuit and, therefore, only the information relevant to the subject motions will be summarized here.

A.   **Factual Background**

In 2011, Governor Patrick signed into law the Gaming Act which created the Commission and authorized it to issue one casino license in each of three regions.  Notably, the Commission was given the authority not to award any casino licenses if the applicants did not meet the relevant criteria.

In the southeastern region, Region C, the Gaming Act contained a built-in preference for a casino under the control of a federally recognized Indian tribe.  The governor was authorized to negotiate a tribal-state compact that would require approval by both houses of the state legislature and the

Secretary of the Interior ("Secretary").  However, if no compact was approved by July 31, 2012, or the Commission determined that a federally recognized tribe would not be able to complete the legal prerequisite of having land taken into trust by the Secretary, the Commission would be required to consider bids for a commercial casino in Region C.

In contrast, the provisions for western Massachusetts (Region B) and the Greater Boston region (Region A) envisioned only a commercial application process.  The applicable criteria consist of a variety of factors including a proposed casino's effect on the local economy, traffic, environment, crime rate and tax base.

**B.    Procedural History**

On the same day the Gaming Act became law, KG Urban filed suit in federal court alleging that § 91 of the Act violated the Fourteenth Amendment's Equal Protection Clause by implementing a racial bias in favor of Indian tribes against others similarly situated.  KG Urban sought declaratory relief invalidating § 91 as unconstitutional and injunctive relief compelling the Commission to accept commercial applications in Region C.

In February, 2012, this Court held that plaintiff's complaint withstood challenges under ripeness, standing, sovereign immunity and Pullman abstention but denied plaintiff's motion for a preliminary injunction.  The Court noted that

further factfinding would not change its legal analysis and, accordingly, dismissed plaintiff's complaint. See KG Urban Enters., LLC v. Patrick et al. ("KG Urban I"), 839 F. Supp. 2d 388 (D. Mass. 2012).

In August, 2012, the First Circuit affirmed this Court's ruling but reversed the dismissal of plaintiff's case, emphasizing that the underlying facts needed to be fleshed out. Importantly, the appellate court rejected the constitutional arguments interposed by both parties and held instead that § 91 could be sustained as a "temporary accommodation" to the IGRA process which the Mashpee did not satisfy due to their lack of land held in trust. See KG Urban Enters., LLC v. Patrick ("KG Urban II"), 693 F.3d 1 (1st Cir. 2012).

On remand, the Court allowed plaintiff to file a more focused Amended Complaint in which it alleges that (1) § 91(e) "on its face" creates an unconstitutional race-based set-aside by granting federally recognized Indian tribes the exclusive right to seek a gaming license in Region C, (2) the Commission's refusal to open Region C to a competitive commercial application process constitutes a continuing racial preference and (3) such conduct violates the Massachusetts Declaration of Rights.

Thereafter, both the Mashpee and Aquinnah tribes sought to intervene but this Court denied their respective motions in June, 2013. See KG Urban Enters., LLC v. Patrick ("KG Urban

-4-

III"), 293 F.R.D. 42 (D. Mass. June 6, 2013).  Two months later,
the Court denied defendants' motion to dismiss for mootness. See
KG Urban Enters., LLC v. Patrick ("KG Urban IV"), No. 11-12070,
2013 WL 4495121 (D. Mass. Aug. 16, 2013).  The Court held a
hearing on the subject cross-motions for summary judgment on
November 21, 2013, after which it took the matter under
advisement.

   **C.   Administrative History**

   In July, 2012, the Commonwealth and the Mashpee tribe
entered into a tribal-state compact approved shortly thereafter
by the state legislature.  In October, 2012, the Bureau of
Indian Affairs ("BIA") rejected the compact on the grounds that
the Commonwealth purportedly retained too high a percentage of
the prospective gaming revenues.  The Commonwealth subsequently
negotiated an amended compact with the Mashpee which was
finalized in March, 2013.

   In April, 2013, after an aborted proposal to create a "dual
track" proposal under which both commercial and tribal casino
applications would move forward simultaneously, the Commission
approved a process to invite commercial applications in Region
C.  That step was taken several months before the July 31, 2012,
deadline for a compact to be approved and before any
determination that a federally recognized tribe would not be

able to take land into trust.[1]  The Commission declared that its determination would be based on the strength of the commercial applications received which, in turn, would depend, in part, upon the impact of any tribal-state compact existing between the Commonwealth and the Mashpee at the time of decision.  The broad criteria include

> economic and other circumstances as they exist at the time of the licensing decision[,] in light of the statutory objective[s] that govern expanded gaming in the Commonwealth and the discretion with which the expanded gaming statute clothes the Commission.

At bottom, a casino operator must prove that the proposed casino would be an economic asset both to the Commonwealth and to its specific region.  In June, 2013, the Commission began accepting commercial applications for Region C with a deadline of September 30, 2013.  KG Urban was the only applicant to submit a commercial application by that deadline.  The Commission has publicly expressed that it expects to make a decision by December, 2014.

On November 15, 2013, the amended compact with the Mashpee tribe was approved by both houses of the state legislature and signed by Governor Patrick.  It was approved by the BIA on January 2, 2014.  The Mashpee tribe's separate application to place land into trust remains pending before the BIA.

---

[1] In taking that unauthorized step, the Commission relied on the implied discretionary power in § 91(e).

II.  **Legal Analysis**

     The Court now addresses the pending motions.  Both parties
have moved for summary judgment on all counts, contesting (1)
whether § 91 is facially constitutional in light of the First
Circuit's remand decision in KG Urban II and (2) whether the
Commission's review of commercial applications is a race-
neutral, "competitive" process.  The parties agree that the
determination of a racial preference is dispositive because it
would warrant strict scrutiny and a finding of constitutional
invalidity.  If, on the other hand, a racial preference is not
found, the parties agree that rational basis review would apply
and, accordingly, the challenged provisions would be upheld.

     Although Count III alleges separate violations of the
Massachusetts Declaration of Rights, the parties agree that its
protections are coextensive with federal constitutional
protections.  Accordingly, the Court's analysis of Count III
will be incorporated into its analysis of the other counts.

     A.    **Summary Judgment**

     The role of summary judgment is "to pierce the pleadings
and to assess the proof in order to see whether there is a
genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d
816, 822 (1st Cir. 1991) (citation omitted).  To prevail, the
moving party must show, through pleadings, discovery and
affidavits, "that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that would affect the case's ultimate outcome. <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Factual disputes of merely ancillary interest will not preclude summary judgment. <u>Id.</u> A genuine issue of material fact exists where the evidence with respect to the disputed material fact "is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

At this stage, the Court views the entire record in the light most favorable to the non-moving party and makes all reasonable inferences in that party's favor. <u>O'Connor</u> v. <u>Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993). To evaluate cross-motions for summary judgment, the Court views each motion separately and applies the applicable presumptions accordingly. <u>Roman Catholic Bishop of Springfield</u> v. <u>City of Springfield</u>, 724 F.3d 78, 89 (1st Cir. 2013). Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

**B.  Supreme Court Precedent**

The Court briefly acknowledges the most important precedential guideposts of the present inquiry. In <u>Morton</u> v.

Mancari, 417 U.S. 535 (1974), the Supreme Court upheld a federal statute granting qualified Indians an employment preference in the BIA under rational basis review as a "political" preference. Id. at 553 n.24.  In Washington v. Confederated Bands & Tribes of the Yakima Indian Nation ("Yakima"), 439 U.S. 463 (1979), the high Court found that state governments occupy a dissimilar constitutional position and, thus, cannot ordinarily legislate with the same authority. Id. at 501.  The Yakima court noted, however, that a state statute "enacted in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over Indians" would also warrant rational basis review. Id. at 500.

Finally, in Carcieri v. Salazar, 555 U.S. 379 (2009), the Supreme Court interpreted the phrase "now under federal jurisdiction" in the Indian Reorganization Act of 1934, the statute under which the Secretary is entitled to take land into trust on behalf of federally recognized Indian tribes, to refer only to tribes that were federally recognized in 1934. Id. at 382.  Notably, however, Justice Breyer wrote a concurring opinion in Carcieri embracing a broader interpret tation because a tribe may have been "under federal jurisdiction" in 1934 even without explicit federal recognition thereof. Id. at 397 (Breyer, J., concurring).

While the Court is skeptical that this constitutional framework faithfully reflects the text and purpose of the Equal Protection Clause, see KG Urban I, 839 F. Supp. 2d at 404, acting upon such misgivings is not within the purview of a United States District Judge.  The Supreme Court may choose to exercise its institutional prerogative to revisit questionable precedent but until then this Court is constrained.

### C.   The First Circuit's Remand

In August, 2012, the First Circuit decided KG Urban's appeal of this Court's initial decision by affirming all aspects except the dismissal of the case and remanding for further proceedings. See KG Urban II, 693 F.3d 1 (1st Cir. 2012). Although the First Circuit's guidance to this district court, and perhaps others, is inscrutable, a careful reading yields a consistent rationale for its decision: despite not being fully authorized by the IGRA, the Massachusetts statute can be considered a valid "parallel mechanism" to the IGRA and, therefore, warrants rational basis review for a "limited period of time." Id. at 25.

The First Circuit found "difficulties" with both parties' arguments on appeal.  It rejected KG Urban's argument that (1) the Gaming Act is a racial preference not enacted pursuant to congressional delegation and (2) the Carcieri decision

forecloses the Mashpee tribe's land-in-trust application as being "not yet resolved." KG Urban II, 693 F.3d at 21.

The appellate court also rejected the Commonwealth's position that the statute is a "political" preference under Mancari or authorized under the IGRA pursuant to Yakima. Mancari applied only to the Federal government and the Mashpee tribe's lack of "Indian lands" precludes a finding that the statute is authorized under IGRA.

The court clarified its thinking, however, when it chided defendants for not offering a "middle ground" legal position that would have allowed a "limited grace period" in which the relevant Indian tribes could attempt to obtain the appropriate approvals from the Secretary of the Interior. Id. at 17. Although phrased conditionally because of the court's procedural posture, namely, review of a denial of a preliminary injunction, the First Circuit embraced the argument that

> [i]f the Secretary is willing under the IGRA to approve a tribal-state compact contingent on the relevant land being later acquired in trust, then the Commonwealth can argue that § 91 establishes a parallel mechanism, meant to facilitate the purposes of the IGRA, even if not precisely authorized by the IGRA, for a limited period of time. The argument, of course, would become weaker with the passage of time and the continuation of the status that there are no "Indian lands" in the region.

Id. at 25. The court also noted that, while a preliminary injunction was not appropriate on the facts before it, KG

Urban's desired equitable relief might be appropriate "at some future date." Id. at 27.

By positing the existence of a constitutional waiting period in which a state could act under what amounts to the penumbra of the IGRA, the First Circuit contemplated that period ending either (1) when the Commission determines that a tribe will not have land taken into trust and then initiates the "competitive license application process" or (2) when a tribe fulfills the criteria outlined in the IGRA. Id. at 25.

The First Circuit took a wait-and-see approach to the subject dispute, despite the fact that several of the uncertain contingencies are not squarely presented in this case.  The court left no doubt, however, that KG Urban would prevail if (1) the Mashpee tribe were ever explicitly foreclosed from taking land into trust (a) by the federal government or (b) by the evolution of the Carcieri decision or (2), assuming the federal government were willing to approve a tribal-state compact in light of the previously discussed uncertainties, if too long an interlude were to elapse before the uncertainty is resolved.

**D.   Equal Protection Analysis**

**1.   Count I – Facial Challenge to § 91**

The Court's first analytical task is to heed the First Circuit's admonition that there is a finite period during which the preference created by § 91 remains constitutional, i.e. a

"limited grace period," not a "lengthy delay." See KG Urban II, 693 F.3d at 17, 27.

Both parties assert that the time period has expired. Defendants contend that the time has elapsed because the Commission has initiated the commercial application process while KG Urban maintains that the First Circuit's grace period has expired by the passage of time. The Court agrees with defendants that the relevant time period should be measured beginning with the passage of the Gaming Act and ending with the start of the commercial application process.

In light of the Commission's commencement of the commercial application process in April, 2013, any other potential uncertainties with respect to the Mashpee tribe's casino license application are immaterial.[2] Therefore, the Court need only determine whether the 18-month delay, more or less, between the passage of the Gaming Act and the opening of the commercial application process in Region C was constitutionally permissible under KG Urban II.

The First Circuit did not provide explicit instructions for establishing when a temporary accommodation becomes

---

[2] The Court previously rejected the argument that the commencement of the commercial application process in Region C rendered moot plaintiff's statutory challenge, see KG Urban IV, 2013 WL 4495121, at *3, but that analysis did not foreclose using the Commission's review of commercial applications as the boundary of the "limited" time period envisioned by the First Circuit.

-13-

constitutionally infirm but it alluded to a method of analysis. On the one hand, it is certainly plausible that, in the context of the lengthy delays associated with securing IGRA-related approval for Indian casinos, a "limited grace period" should be measured in years. See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 132 S. Ct. 2199, 2204 (2012) (describing the lengthy administrative delays associated with Indian land-in-trust applications). On the other hand, the First Circuit specifically lamented that "the Commission might wait years," KG Urban II, 693 F.3d at 26, and noted, in the context of the delays discussed in Patchak, that "lengthy delays ... would undercut the argument that § 91 is meant as a temporary accommodation to the IGRA process." Id. at 27. According to that logic, a "temporary" accommodation ought not endure for years.

While the Court acknowledges that the latter approach most closely comports with the logic of KG Urban II, any attempt to ascertain an exact point in time at which the Constitution is violated would amount to guesswork. Fortunately, the Court need not be so precise because it is persuaded that the subject delay of 18 months falls short of a constitutionally prohibited delay. The maximum period a state may provide as a "temporary accommodation" under IGRA to a landless, federally-recognized Indian tribe is for another court to decide.

-14-

Because the Court finds that the Commission's opening of
the commercial application process frames the applicable time
period, it need not speculate as to the ultimate resolution of
the so-called Carcieri question with respect to the rights of
the Mashpee or Aquinnah tribes to take land into trust. See
Carcieri, 555 U.S. at 397.  Any lingering uncertainty with
respect to the Mashpee tribe's eligibility is immaterial.

The Court also rejects KG Urban's contention that the
delays in Region C's commercial application process relative to
those in Regions A and B (1) were caused by the Commonwealth's
racial preference and (2) unconstitutionally disadvantaged KG
Urban vis-à-vis other casino applicants.  Holding the waiting
period constitutional also renders the later start date for
opening commercial applications in Region C constitutionally
permissible.

Accordingly, with respect to plaintiff's facial challenge
to § 91 of the Gaming Act, plaintiff's motion for summary
judgment will be denied and defendants' motion for summary
judgment will be allowed.

### 2.   Count II – As-Applied Challenge to the "Competitive Licensing Process"

KG Urban also challenges the Commission's conduct, claiming
that it has refused to initiate a "competitive application
process" in Region C despite its clear authority under § 91 to

-15-

oversee "the same race-neutral, competitive application process" that is ongoing in Regions A and B.  KG Urban suggests that the Commission has a "thumb on the scales" for the Mashpee because it has explicitly stated that it will consider "the then current status of the Tribal-State and Federal Trust Land process" in evaluating commercial applications in Region C.

Defendants respond that the Commission voted in April, 2013, to begin a race-neutral application review process in Region C.  According to the unambiguous terms of the Commission's unchallenged governing statute, applications will be evaluated based on a variety of factors, including "economic and other circumstances as they exist at the time of the licensing decision."  One such factor includes a potential Indian casino, whether a resort-casino style facility authorized pursuant to the tribal-state compact or a smaller facility authorized separately under IGRA.  Applications in Region C must take these possibilities into account simply because Region C is home to the two federally recognized tribes in Massachusetts. The Commission has acknowledged that it retains the right to determine that a

> federally approved (or imminent) Indian casino in Region C would undermine the viability of a "second," state-licensed casino in the region.

Therefore, defendants believe KG Urban has already received the remedy it sought all along: the chance to compete for a casino license in southeastern Massachusetts.

To assess KG Urban's challenge to the Commission's application review process, the Court must determine whether the disclosed criteria of the Commission constitute an explicit racial preference and, if not, whether the neutral criteria are being applied in a racially discriminatory manner.

### a.   Explicit Racial Preference

All parties concede that an explicit racial preference in the selection criteria of the Commission would warrant strict scrutiny under the Equal Protection Clause. See Anderson ex rel. Dowd v. City of Boston, 375 F.3d 71, 82 (1st Cir. 2004) (citing Grutter v. Bollinger, 539 U.S. 306, 326 (2003)).  The parties further agree, and the Court concurs, that the application of strict scrutiny to an explicit racial preference by the Commission would yield a swift invalidation of the subject procedure.

In the instant case, however, the Court finds no express racial preference.  Neither the Commission's declared procedures nor the applicable standards constitute explicit, race-based preferences.  The criteria to be employed by the Commission speak in broad terms to an array of factors, including protecting the state lottery's viability, promoting local

businesses, maximizing capital and workforce investment,
building a gaming establishment of "high caliber," addressing
problem gambling, maximizing revenues received by the
Commonwealth, creating a secure and robust gaming market and
mitigating potential impacts on host and surrounding
communities. See Mass. Gen. Laws ch. 23K, § 18(1)-(19).  The
applicable criteria do not discuss Indian tribes.

The Court acknowledges that the Commission has, of course,
on several occasions invoked the possibility of an Indian casino
as a potential influence on a future decision.  A careful
reading of this evidence, however, indicates that the Commission
has done so as a means of illustrating a specific instance of
how it would apply a neutral criterion, namely the economic
consequences, to the subject casino.  Indeed, the statutory
criteria require this racially neutral analysis to be completed
for the commercial casino applications in all three regions. Id.
§ 18 ("[T]he commission shall evaluate and issue a statement of
findings of how each applicant proposes to advance the following
objectives.").

Accordingly, the Court finds no explicit race-based set-
aside in the Commission's procedure for reviewing commercial
casino applications.

### b.   Implicit Racial Preference

Finding no explicit racial preference, the Court turns to a more difficult issue: whether an implicit preference lurks under the surface of the Commission's facially neutral criteria.  A discriminatory racial purpose need not be "express or appear on the face of the statute." Washington v. Davis, 426 U.S. 229, 241 (1976).  In the hands of those determined to discriminate, a neutral statute can become a tool for invidious discrimination. See Yick Wo v. Hopkins, 118 U.S. 356 (1886).

### i. Legal Standard

To evaluate the adherence of a facially neutral policy to the Equal Protection Clause

> an inquiry into intent is necessary to determine whether the [policy] in some sense was designed to accord disparate treatment on the basis of racial considerations.

Washington v. Seattle Sch. Dist., 458 U.S. 457, 484-85 (1982). The Court applies a burden-shifting framework to guide its analysis.  First, a plaintiff must establish a prima facie case that a discriminatory purpose was present and that it was a "motivating factor" in the defendant's decision. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 270-71 (1977).  Second, if a discriminatory purpose is established, the defendant must then prove that it would reach the same decision in the absence of the discriminatory purpose. Id. at

270 n.21; see also Smith v. Wilson, 705 F.3d 674, 681-82 (7th Cir. 2013).  Courts use this process to determine whether the state action at issue "was intended to, and did in fact, discriminate." Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 420 (1977).

At the first step, finding a state actor's discriminatory purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266.  Factors relevant to such an inquiry include any disproportionate racial impact of the policy, the justification for any such impact and the legislative and administrative background of the decision. See Dowd, 375 F.3d at 83.  The Court need not credit implausible arguments and an improper purpose may be inferred from the totality of the evidence at hand. Davis, 426 U.S. at 242.

Discerning the racially discriminatory application of an otherwise racially neutral statute is notoriously difficult, however, and the subject case is no exception.  Were the Commission intent on acting upon a racial preference, it need only first pay lip service to neutral economic, social and demographic criteria and then deny KG Urban's license. Alternatively, the Commission could plausibly deny KG Urban's license based on actual reference to those racially neutral criteria without any invidious pretext.  At the summary judgment

-20-

stage, however, the Court need only indulge reasonable inferences against the non-moving party, obviating the need to grapple with such intellectual uncertainty.

Two additional issues give the Court pause in its analysis. First, although courts have assessed facially neutral policies in light of "disproportionate racial results," this Court can find no such evidence because the Commission has not yet reached a decision. See, e.g., Dowd, 375 F.3d at 89. Indeed, any decision would yield only a single data point. See id. (rejecting inference of racially invidious motive where "there is no clear pattern of disparate racial impact, much less the 'stark' pattern contemplated by [the Supreme Court]"). Accordingly, the Court's inquiry addresses whether the Commission's facially neutral criteria are genuine.[3]

Second, the Court acknowledges the relative dearth of relevant caselaw in this area. Applicable precedent arises in the context of school desegregation, see, e.g., Anderson, 375 F.3d 71, zoning discrimination, see, e.g., Arlington Heights, 429 U.S. 252, employment discrimination, see, e.g., Davis, 426 U.S. 229, but all such factual scenarios are dissimilar to the subject dispute. Nonetheless, at their core each cited opinion

---

[3] The Court previously found the subject case to be ripe for adjudication and, notwithstanding the fact that the focus of the case at this juncture has shaken the foundation of that determination, adheres to that prior decision. See KG Urban III, 293 F.R.D. 42.

concerns alleged unconstitutional discrimination based on race
in the context of a facially neutral policy or statute.

### ii. Application

Drawing all reasonable inferences in favor of KG Urban, the
Court first finds that it has established a prima facie case
that the Gaming Commission is acting with a discriminatory
purpose.  The Court also finds, however, that the Commission can
prove that it would reach the same decision in the absence of
any discriminatory purpose.  In other words, while KG Urban can
provide some evidence that the criteria employed by the
Commission are racially motivated, the Commission can meet its
burden of explaining its criteria "on grounds other than race."
Arlington Heights, 429 U.S. at 266.

### a. Prima Facie Case

At the first step, after drawing all reasonable inferences
in favor of KG Urban, an inquiry into the available
circumstantial and direct evidence reveals some evidence of
discriminatory intent. See id.  While no racially
disproportionate impact is evident, the record permits several
inferences of discriminatory intent from the legislative and
administrative background of the Commission's review of
commercial applications. See Dowd, 375 F.3d at 83.

First, KG Urban points to several statements by Governor
Patrick that call into question the true "competitiveness" of

-22-

the commercial application procedure in Region C.  The tribal-
state compact continues to mention the Mashpee tribe's purported
"exclusivity" in Region C.  Moreover, while Governor Patrick
himself does not wield direct power over the Commission's
decision, his public statements reinforce the perception that
the application process in Region C is tilted toward the Mashpee
tribe.

More importantly, the Commission itself has consistently
mentioned a potential Mashpee casino, even in public statements
with respect to the competitive commercial application process
which supposedly has no connection to the Mashpee's application.
Drawing reasonable inferences in favor of KG Urban's position,
the Court concludes that plaintiff has demonstrated a prima
facie case that the state action at issue, despite being
facially neutral, is intended to discriminate. See Brinkman, 433
U.S. at 420.  The burden thus shifts to the Commission to rebut
the presumption created by the establishment of a prima facie
case.

### b. Rebutting the Presumption

At the second step of the burden-shifting framework, the
Court adopts all reasonable inferences in favor of KG Urban's
position but nonetheless concludes that the Commission can
demonstrate that it would reach the same decision absent any

discriminatory purpose. See Arlington Heights, 429 U.S. at 270 n.21.

KG Urban argues that a racial preference persists by virtue of the Commonwealth's continued references to the Mashpee's status in Region C. Reduced to its essence, KG Urban's argument rests on the purported arbitrariness of Region C's borders and specific statements made on behalf of the Commonwealth and the Commission.

The Court notes initially that while Governor Patrick's statements may provide some circumstantial evidence of discriminatory intent, they are not directly at issue in Count II which challenges the procedures of the Commission, not actions of the Commonwealth itself.

Plaintiff's suggestion that the Commonwealth is "speaking out of both sides of its mouth" is unfounded because the Commonwealth and the Commission are two separate legal entities. Notwithstanding their pairing as named defendants, Governor Patrick has no role in evaluating commercial applications in Region C, just as the Commission had no role in the enactment of § 91(e). Even after drawing all reasonable inferences in favor of plaintiff, it would be implausible to attach any significance to the statements of an actor with no formal role in a potentially suspect procedure. See Davis, 426 U.S. at 242.

-24-

Accordingly, the Commonwealth's statements are inapplicable at this stage.

KG Urban also contends that it is irrational, and therefore suspect, for the Commission to weigh the possible impact of an Indian casino in the process of reviewing applications for Region C but not for Regions A and B, as it has suggested it will do.  If, as KG Urban argues, there is no rational reason to discuss Indian tribes exclusively in Region C, then statements to that effect by the Commission would be strong evidence of a racial preference.

KG Urban's objection is, however, unfounded.  In contending that the Mashpee could apply for the placement of land in trust anywhere in the Commonwealth, plaintiff ignores federal regulations which limit such applications so as to

> demonstrate a significant historical connection to the
> land [which must be] near where a significant number
> of tribal members reside.

25 C.F.R. § 292.12.  The record suggests that the historic homeland of the Mashpee is located in southeastern Massachusetts and the Aquinnah tribe owns land on Martha's Vineyard.  Those tribes are the only federally recognized Indian tribes in the Commonwealth.  Thus, it is neither arbitrary nor discriminatory to discuss the presence of federally recognized Indian tribes in Region C.

KG Urban's effort to refute this conclusion is also unpersuasive. Plaintiff points out that the Commission has identified a potential Indian casino in Region C as a relevant criterion for the granting of a license but has not done the same for existing casinos that will affect the economic viability of the commercial casinos in Regions A or B. It points out that the Mashpee's potential casino in Taunton would be only a short distance from Regions A and B but that fact is unmentioned in the Commission's public statements about its review of applications for those regions.

That argument fails to distinguish between criteria outlined in a duly enacted state statute and statements contained in a press release. The mere fact that the Commission's press releases with respect to Regions A and B have differed from those with respect to Region C does not prove racial discrimination. The Court declines to find constitutional significance in the differing verbiage of the Commission's press releases.

Moreover, consulting the text of the Commission's press release itself fails to convince the Court that a racial preference is present. The relevant portion of the Commission's September 30, 2013, press release reads as follows:

> After the Phase 2 [Request for Application] deadline, the Commission, using the same evaluation criteria it will use in Region A and B, will make a decision about

> [the] award of a commercial license after taking into
> account the economic consequences of the then current
> status of the Tribal-State and Federal Trust Land
> process, the contents of the commercial Phase 2 RFA
> responses, the regional and statewide gaming and other
> economic conditions then existing and forecast, and
> all other relevant information as it then exists.

That passage demonstrates that the general criteria evaluated by the Gaming Commission are extensive and include a potential Indian casino simply because they are so broad.  In other words, because the Gaming Commission's decision requires assessing "all relevant information," it necessarily includes assessing the prospect of an Indian casino.

While "affirmations of good faith" alone are insufficient to rebut an inference of racial discrimination, they buttress a valid, racially neutral explanation.  See Alexander v. Louisiana, 405 U.S. 625, 632 (1972).  The Court finds that, even after adopting all reasonable inferences in favor of KG Urban, the Commission can show that "permissible racially neutral selection criteria and procedures" would yield a non-discriminatory result.  Id.  The totality of the evidence at hand supports such a determination.  See Davis, 426 U.S. at 242.

The Court concludes that the Equal Protection Clause does not prohibit the Commission from assessing KG Urban's commercial application based on a variety of statutorily mandated economic, social or demographic factors that, by implication, include the presence or potential presence of an Indian casino.  The

-27-

Commission has always possessed the right to refuse to issue <u>any</u> casino licenses should the applicants fail to meet the relevant criteria.  Therefore, with respect to plaintiff's as-applied challenge to the commercial application procedure alleged in Count II, the Court will deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment.

**ORDER**

In accordance with the foregoing, defendants' motion for summary judgment (Docket No. 138) is **ALLOWED** and plaintiff's motion for summary judgment (Docket No. 141) is **DENIED**.

**So ordered.**

/s/ Nathaniel M. Gorton_____
Nathaniel M. Gorton
United States District Judge

Dated January 9, 2014

-28-